[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 23, 2004
THOMAS K. KAHN
CLERK**

No. 02-16718

D. C. Docket No. 98-00597 CV-J-21-HTS

CAFÉ EROTICA OF FLORIDA, INC.,
a Florida Corporation,
CAFÉ EROTICA / WE DARE TO BARE /
ADULT TOYS / GREAT FOOD / EXIT 94,
INC., a Florida Corporation,

Plaintiffs-
Counter-Defendant-
Appellees.

versus

ST. JOHNS COUNTY,
a political subdivision of the State of Florida

Defendant-
Counter-Claimant-
Appellant.

No. 03-11385

D.C. Docket No. 01-00342 CV-3-J-21-HTS

CAFE EROTICA/WE DARE TO BARE
/ADULT TOYS/GREAT FOOD/EXIT 94,
INC., a Florida Corporation,

Plaintiff-
Appellee,

versus

ST. JOHNS COUNTY, a
political subdivision
of the State of Florida,

Defendant-
Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(February 23, 2004)**

Before DUBINA, WILSON and KRAVITCH, Circuit Judges.

WILSON, Circuit Judge:

I.   BACKGROUND

This appeal consolidates two cases involving facial and as-applied challenges to the St. Johns County, Florida, sign ordinance ("Ordinance" or "Ordinance 99-51"), codified as Article VII of the St. Johns County Land Development Code ("LDC").  Each case presents identical legal issues.  We

review the grant of summary judgment in favor of appellees, Café Erotica of Florida, Inc. ("Café" or "Café Erotica"), and Café Erotica / We Dare to Bare / Adult Toys / Great Food / Exit 94, Inc. ("We Dare to Bare").

The first case involves Café Erotica, an adult entertainment establishment in St. Johns County ("County"), Florida. Café has advertised its business on billboards located along Interstate 95. County officials issued several citations to Café for constructing signs on its business premises, advertising on the side of a truck, and erecting "political message" banners[1] without following the County's required permitting procedures. On June 19, 1998, Café challenged the then-current St. Johns County sign ordinance, Ordinance 90-9. The district court issued a preliminary injunction against its enforcement. The County subsequently passed four new versions of its sign ordinance, finally enacting Ordinance 99-51.

In the other case, We Dare to Bare brought a facial challenge against Ordinance 99-51, and also alleged that the County applied Ordinance 99-51 against it in an unconstitutional manner with respect to a billboard it erected along Interstate 95. We Dare to Bare argued that the County took an impermissibly long

---

[1] One banner read, "Karen Bruner is An Incompetent County Official." Karen Bruner is the public official who issued citations to Café. Another read, "James Acosta is a fat ass Barney Fife. He has cost the county thousands of $ in lost lawsuits for using selective [e]nforcements." Mr. Acosta is the Supervisor of Code Enforcement for St. Johns County.

time to render its licensing decision and imposed additional requirements upon it

not imposed on similarly situated businesses.[2]

Both district courts permanently enjoined the County from enforcing

Ordinance 99-51 and granted summary judgment to the plaintiffs. Each district

court declared Sections 7.00.01,[3] 7.00.08,[4] and 7.03.01[5] of Ordinance 99-51

unconstitutional, and determined that these sections could not be severed from the

rest of Article VII of the LDC.[6]

The district courts confined their analyses to Ordinance 99-51. However,

after enacting Ordinance 99-51, the County amended its sign regulation, enacting

---

[2] The billboard at issue was erected by Jerry Sullivan, incorporator and president of approximately thirty-five Florida corporations, including We Dare to Bare and Café Erotica. The billboard contains the words "Café Erotica," "We Dare to Bare," "Great Food," "Adult Toys," and "Exit 94, Inc.." The paint colors call the viewer's attention to the phrases "Café Erotica" and "We Dare to Bare." A small sign is affixed below the billboard facing and reads, "Fish Camp," and includes a telephone number. Mr. Sullivan did not obtain a permit for the structure. Further, the structure was erected on property owned by neither We Dare to Bare nor Café Erotica, with no business activities of either corporation conducted there. The County issued a notice of violation on January 30, 2001. The sign has since been removed.

[3] Section 7.00.01 sets forth the time limits in which St. Johns County must approve or deny a sign permit.

[4] Section 7.00.08 describes the appeals process and sets time limits for challenging a permit denial.

[5] Section 7.03.01 sets forth the requirements for "special use signs," and specifically limits "political message signs" to thirty-two square feet, or six square feet if located in a residential district.

[6] The district court in *We Dare to Bare* granted We Dare to Bare's Summary Judgment Motion "for the reasons and to the extent set forth in the [Café] Court's December 4, 2002 Order."

4

Ordinance 01-34 on May 15, 2001. We Dare to Bare attempted to challenge Ordinance 01-34, arguing that it is substantively the same as the predecessor law and contains the same constitutional flaws. Rather than having the parties amend their pleadings, the district court ruled only on the constitutionality of Ordinance 99-51, as the challenged provisions of Ordinance 99-51 were substantially the same under the new ordinance. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir. 2000) ("[W]hen an ordinance is repealed by the enactment of a superseding statute, then the 'superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law. To the extent that those features remain in place, and changes in the law have not so fundamentally altered the statutory framework as to render the original controversy a mere abstraction, the case is not moot.'") (quoting *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992)). Thus, we consider only the constitutionality of Ordinance 99-51 in this appeal. Specifically, we consider appellees' facial challenges to sections 7.00.01, 7.00.08, and 7.03.01 of Ordinance 99-51, taking into account other provisions that may affect the constitutionality of those provisions.

Appellees assert two facial challenges. First, they argue that Ordinance 99-51 is a content-based restriction on speech because certain provisions favor

5

commercial speech over political speech. Specifically, appellees argue that because the Ordinance limits "political message signs" to thirty-two square feet while allowing commercial billboards to be as large as 560 square feet, the County impermissibly discriminates against political speech. Second, appellees argue that the permitting requirements of Ordinance 99-51 act as an unconstitutional prior restraint because the Ordinance does not contain the required procedural protections for licensing schemes pursuant to *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990).

The County responds that Ordinance 99-51 is a constitutional content-neutral ordinance. Under the County's reading of the Ordinance, both on-premise and off-premise signs can contain commercial and noncommercial content. Thus, according to the County, political messages can be placed on billboards. The County admits that it regulates various types of signs differently, but contends that any differences in treatment are due solely to content-neutral factors related to safety and aesthetics. The County believes that nothing in the Ordinance "allows" it to deny a permit based on a sign's content. The County, however, admits that because the Ordinance treats different types of signs differently, the content of a sign must be "considered for determining the location and duration of a sign."

II.      APPLICABLE ORDINANCE PROVISIONS

Ordinance 99-51 requires anyone wishing to erect a sign larger than fifteen square feet in area to obtain a sign permit. *See* LDC § 7.00.01 & § 3.09.08. Further, the LDC requires a permit for all outdoor advertising displays.[7] Café's banner is a "sign" within the above definition, as are the billboards that Café wishes to construct. Thus, Café would have to obtain a permit before erecting these structures. The County Administrator of St. Johns County ("County Administrator") makes all permitting decisions in accordance with the Standard Building Code.[8] *See* LDC § 7.00.01.

Appellees challenge various sections of the Ordinance setting forth the time in which the County must perform its obligations. Ordinance 99-51 states:

> Applications for Sign Permits shall be approved or denied, by the County Administrator, within fourteen (14) days of submittal of a fully completed application. If more information is required from the applicant . . ., the fourteen (14) day period shall run from receipt of that additional information. If the applicant certifies in writing that the application is complete, the fourteen (14) day period shall run from the date of the County's receipt of that writing.

---

[7] "Outdoor advertising display" is defined in the LDC as "any letter, figure, character . . . marquee sign, design, poster [etc.] which shall be so constructed, placed, attached . . . so that the same shall be used for the attraction of the public to any place, subject, person, firm, corporation . . . whatsoever, which is displayed in any manner whatsoever outdoors." LDC § 12.01.00.

[8] The "Standard Building Code" is the "latest edition of the technical regulations for Structures as promulgated by the Southern Building Code Congress [International], Inc. and adopted by St. Johns County." LDC § 12.00.01.

LDC § 7.00.01(C).[9]

Any permitting decision may be appealed to the Board of County Commissioners within thirty days of the decision. The Board of County Commissioners has fifteen days to render a written decision. *See* LDC § 7.00.08. This decision may be appealed to the Circuit Court within thirty days. The Ordinance states, "*[i]n any case where the message or content of the proposed Sign affected the denial of the permit,* the County shall bear the cost of initiating the case with the Circuit Court and shall also bear the burden of justifying the denial." *Id.* (emphasis added).

Ordinance 99-51 contains a general severance provision stating, "[i]f any section, phrase, sentence, or portion of this Ordinance or the Code is for any reason held invalid or unconstitutional . . . such portion shall be deemed a separate, distinct, and independent provision, and such holding shall not affect the validity of the remaining portions thereof." Ordinance 99-51 Recitals, ¶ 7.

Ordinance 99-51 regulates different types of signs differently, including the following sign categories: (1) billboards; (2) on-premise signs; and (3) "special

---

[9] Notably, Ordinance 01-34 amends this section of the LDC, and allows the County Administrator thirty days to deny or approve a fully completed sign application and twenty days to notify the applicant of any deficiencies. If the application is not approved or denied within the thirty-day period, the new Ordinance deems the sign permit to be denied.

use signs," which include "political message signs."

## 1.  BILLBOARDS

Part 7.01 regulates billboards.  Billboards are limited to thirty-five feet in height, and can be as large as 378 square feet – or 560 square feet if located along the interstate.  *See* LDC § 7.01.03(A)-(B).  Billboards are defined as signs "over thirty-two (32) square feet in size that [are] used for *off-premise outdoor advertising and display*," and they also include on-premise signs that exceed 300 square feet.  LDC § 12.01.00 (emphasis added).  The Ordinance defines "advertising message" as including not only commercial messages, but also "political copy intended to directly or indirectly promote a candidate or issue." LDC § 12.01.00.

Billboards are subject to greater restrictions than on-premise signs with regard to the number of billboards and their location.  *Compare* LDC § 7.01.01(A) (restricting new billboards to designated locations, and stating that no increase in the total number of billboards shall be permitted "unless fully compliant with this Code") *with* LDC § 7.02.01(A) (limiting on-premise ground signs to four per location, but placing no limits on the number of building signs such as marquee and canopy signs).

Section 7.01.01(C) concerns severability of the billboard provisions.  It

9

states, "[i]f any of the provisions of this Code, including [provisions] pertaining to permitting new Billboards is found unconstitutional . . . all provisions pertaining to allowing and permitting new Billboards shall be deemed voided in totality and no new Billboards shall be allowed."

## 2. ON-PREMISE SIGNS

Part 7.02 regulates on-premise signs. On-premise signs are generally limited to 150 square feet. *See* LDC § 7.02.01(B). Those within 500 feet of the interstate are allowed up to 300 square feet of advertising space. *See* LDC § 7.02.02(B). On-premise signs include advertisements for a business, person, or service located on the sign's premises. Off-premise signs, by contrast, contain similar advertisements for a product or business that is not located or furnished on the property where the sign is erected. *See* LDC § 12.01.00.

## 3. POLITICAL MESSAGE SIGNS

"Political message signs" are regulated under a third category of signs called "special use signs." LDC § 7.03.00. A political message sign is defined as "*[a]ny Sign* containing a *non-commercial opinion* or endorsement message and not containing a commercial message." LDC § 12.01.00 (emphasis added). Under this definition, the separate requirements for "political message signs" appear to govern all non-commercial signs. Political message signs are limited by §

7.03.01(L) to between six and thirty-two square feet. Commercial signs and billboards, on the other hand, can be as large as 560 square feet. *See* LDC §§ 7.01.03(A), 7.05.01(A).

## III. JURISDICTION AND STANDING

Both appellees have standing to challenge Ordinance 99-51. In order to have standing, a plaintiff must prove that (1) it has sustained an injury "of a legally protected interest;" (2) a "causal connection [exists] between the injury and the conduct complained of;" and (3) the injury is capable of being redressed by the court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted); *Granite State Outdoor Adver.*, 351 F.3d 1112, 1116 (11th Cir. 2003). Moreover, the plaintiff's injury must be "concrete and particularized, and actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations omitted). Pursuant to various provisions of St. John's County's sign Ordinance, both Café Erotica and We Dare to Bare have been ordered to remove certain signs, some of which display political messages. In addition, both parties retain substantial interests in the outcome of this litigation, as both parties stand to gain by a favorable ruling. As such, both parties may challenge Ordinance 99-51 as applied.

We also have jurisdiction to consider whether Ordinance 99-51 is facially

invalid. When a statute is challenged as facially invalid, a court may entertain such a challenge where every application of the challenged provision may create an impermissible risk of suppression of ideas. *See Freedman v. Maryland*, 380 U.S. 51, 56-7 (1965). As determined below, with respect to the decision of whether to issue or deny a sign permit, Ordinance 99-51 places "unbridled discretion" in the hands of the County Administrator. Thus, Ordinance 99-51 creates "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections," and we may therefore entertain a facial challenge. *See City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). Further, the fact that Café Erotica and We Dare to Bare primarily engage in commercial advertising does not prevent us from considering their facial challenges. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 505 n.11 (1981).

## IV. STANDARD OF REVIEW

We review orders granting summary judgment de novo. *See Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000).[10] We also review decisions of

---

[10] A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

lower courts addressing the constitutionality of ordinances de novo. *Id*.

## V.    PRIOR RESTRAINT ANALYSIS

We analyze certain challenged portions of Ordinance 99-51 under prior restraint analysis and others under content-based analysis. We start with prior restraint analysis because our holding in this section highlights the potential for content-based decisionmaking under Ordinance 99-51. When analyzing a facial challenge, we must analyze the statute as written. *See Redner v. Dean*, 29 F.3d 1495, 1501 (11th Cir. 1994).

A prior restraint on speech exists "when the government can deny access to a forum for expression before the expression occurs." *United States v. Frandsen*, 212 F.3d 1231, 1236-37 (11th Cir. 2000). Ordinance 99-51 requires a permit prior to erecting any new billboard,[11] thereby making it a restraint on speech in advance

---

matter of law." FED. R. CIV. P. 56(c); *see also Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1271 (11th Cir. 2003). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, and we will construe the record and all inferences from it in the light most favorable to the non-moving party. *See id.* at 1271-72.

[11] The County argues that a permit is only required for construction of a new sign and is not needed to change the message of an existing sign, thereby circumventing prior restraint concerns. However, the prevention of new sign construction goes hand-in-hand with the resulting suppression of speech. Not all speakers have access to existing billboards, and other forms of communicating can be "insufficient, inappropriate and prohibitively expensive." *See Metromedia*, 453 U.S. at 525. Thus, some speakers, like Café Erotica, could effectively be silenced by the County's permitting requirements. *See, e.g., Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 226 n.16 (1989) ("[s]uch a [potentially] blanket prohibition cannot coexist with the constitutional protection of political speech"); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 293 (2000) (noting that "there may be cases in which banning

13

of its occurrence. *See Ward v. Rock Against Racism*, 491 U.S. 781, 795 n.5 (1989) (for prior restraint analysis, "[t]he relevant question is whether the challenged regulation *authorizes* suppression of speech in advance of its expression"). Although "prior restraints are not unconstitutional *per se*[,] any system of prior restraint . . . bear[s] a heavy presumption against its constitutional validity." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975). Accordingly, we must consider whether Ordinance 99-51 is an impermissible prior restraint.

Prior restraints must (1) ensure that permitting decisions are made within a specified time period, *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226-27 (1990) (plurality opinion) (citing *Freedman*, 380 U.S. at 59); and must (2) avoid "unbridled discretion" in the hands of a government official. *See id.* at 225-26 (quoting *Lakewood*, 486 U.S. at 757); *see also Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999) ("licensing schemes commonly contain two defects: discretion and the opportunity for delay"). The Café district court found that Ordinance 99-51 lacked both of these requirements. After careful analysis, we find that the first requirement above is satisfied; however, as discussed below, we also find that Ordinance 99-51 unconstitutionally grants unbridled discretion in the hands of just one government official.

---

the means of expression so interferes with the message that it essentially bans the message").

14

A.    *FW/PBS* REQUIREMENT #1:  SUFFICIENT TIME LIMITS FOR
      ISSUING PERMITTING DECISIONS

"A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech," and therefore will not be tolerated.  *FW/PBS*, 493 U.S. at 227 (plurality opinion) .  To satisfy this requirement, an ordinance should contain two procedural safeguards: (1) licensing officials must be required to make prompt decisions; and (2) prompt judicial review must be available to correct erroneous denials.  *Lady J. Lingerie*, 176 F.3d at 1362-63 (citation omitted).  Ordinance 99-51 satisfies the first *FW/PBS* requirement because it contains both procedural safeguards set forth above.

With respect to the first safeguard – that licensing officials be required to make prompt decisions – Ordinance 99-51 states,

> Applications for Sign Permits shall be approved or denied, by the County Administrator, within fourteen (14) days of submittal of a fully completed application.  If more information is required from the applicant in order to complete review of the application, the fourteen (14) day period shall run from receipt of that additional information. If the applicant certifies in writing that the application is complete, the fourteen (14) day period shall run from the [certification] date.

LDC § 7.00.01(C).

The Café district court was concerned that, under these requirements, the County Administrator could unduly delay the permitting process.  However,

15

Ordinance 01-34 amends this section. *See Coalition for the Abolition of Marijuana Prohibition*, 219 F.3d at 1310 (noting that a superseding ordinance moots a case to the extent that it removes challenged features of the prior law). The Ordinance as amended now gives the County Administrator thirty days to deny or approve a fully completed sign application and twenty days to notify the applicant of any deficiencies. Significantly, if the application is not approved or denied within the thirty-day period, the sign permit is deemed denied. *See* Ordinance 01-34 § 7.00.01(C). Thus, the County Administrator cannot delay the permitting process indefinitely, and an applicant should receive a final denial well within ninety days of its initial submission. *See Redner*, 29 F.3d at 1500 (holding that a forty-five day restraint is reasonable, and expressing agreement with other federal courts that have found time periods as long as ninety days to be reasonable); *but see Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1314 (11th Cir. 2003) (ordinance setting forth no real time limits deemed unconstitutional).

Ordinance 99-51 also satisfies the second safeguard – that "prompt judicial review" be available. With respect to licensing schemes, this requirement means that the ordinance must provide for prompt judicial *review* of a permit denial, rather than prompt judicial *resolution*. *See Boss Capital, Inc. v. City of*

16

*Casselberry*, 187 F.3d 1251, 1256 (11th Cir. 1999). Ordinance 99-51 satisfies this requirement because LDC § 7.00.08 provides that an adverse decision may be appealed to the Circuit Court within thirty days. *See id.* (finding "prompt judicial review" requirement met where ordinance specified that licensing decisions "may be *immediately reviewed* as a matter of right by the Circuit Court").

B.  *FW/PBS* REQUIREMENT #2:  NO UNBRIDLED DISCRETION

Although Ordinance 99-51 satisfies the first *FW/PBS* requirement, we find that Ordinance 99-51 is an unconstitutional prior restraint because the discretion it grants to the County Administrator extends beyond permissible boundaries. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969) ("a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"); *Saia v. New York*, 334 U.S. 558 (1948) (ordinance found facially invalid because discretion of decision-maker was unlimited); *Fly Fish, Inc.*, 337 F.3d at 1313 (ordinance struck down as unconstitutional because it "exceed[ed] the limits of permissible 'ministerial discretion'"); *Lady J. Lingerie*, 176 F.3d at 1362 ("virtually any amount of discretion beyond the merely ministerial is suspect" and therefore "[s]tandards must be *precise* and *objective*").

17

The County argues that its Ordinance does not give the County Administrator discretion to reject a sign based on its content because the sign applicant need not disclose the sign's message. Even if we were to accept this argument, however, the Ordinance still fails to address our primary concern – that there be "reasonably specific and objective" grounds for denying a permit application that are "narrowly drawn, reasonable, and definite" so as to sufficiently reduce the *potential* for content-based decisionmaking. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002); *Redner*, 29 F.3d at 1501 (citations omitted) (without adequate standards to guide the licensing authority, "[w]e cannot depend on the individuals responsible for enforcing the Ordinance to do so in a manner that cures it of constitutional infirmities").

Ordinance 99-51 lacks specific and definite statutory checks on the County Administrator's discretion, thereby impermissibly creating the potential for content-based discrimination. Ordinance 99-51 contains the same constitutional flaws as the ordinance struck down in *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988). In *Lakewood*, the Supreme Court noted that "the face of the ordinance itself contains no explicit limits on the mayor's discretion. Indeed, nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." *Id.*

at 769. Like the *Lakewood* ordinance, Ordinance 99-51 contains no explicit limits on the County Administrator's discretion. Rather, Ordinance 99-51 simply states that permits shall be reviewed by the County Administrator and issued "in accordance with the [Standard Building Code]." LDC § 7.00.01.[12] A review of the Standard Building Code reveals that Ordinance 99-51 does not provide specific grounds under which the Administrator may deny a billboard permit application. Any such grant of unrestrained discretion to an official responsible for regulating First Amendment activities is facially unconstitutional. *See Atlanta Journal and Constitution v. City of Atlanta Dept. of Aviation*, 322 F.3d 1298, 1311 (11th Cir. 2003) (en banc). Thus, as the Supreme Court has noted, the Constitution requires that St. Johns County "establish neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered." *Lakewood*, 486 U.S. at 760. Such criteria should be expressly included within the County's sign Ordinance, and should set forth specific content-neutral grounds under which a sign permit may be denied. *See, e.g., Thomas*, 534 U.S. at 322 (upholding an ordinance listing thirteen specific grounds under which a permit application may be denied, none of which "has anything to

---

[12] Additionally, "permit applications for on-premise signs shall be in accordance with Part 7.02.00," which sets forth requirements for on-premise signs. LDC §§ 7.00.01, 7.02.01.

do with what a speaker might say").[13]

## VI. APPLICABLE FIRST AMENDMENT FRAMEWORK FOR CONTENT BASED ANALYSIS

We now consider whether § 7.03.01, which limits "political message signs" to thirty-two square feet, impermissibly favors commercial messages over non-commercial ones. We must first determine the appropriate analytical framework to apply when considering the constitutionality of regulations restricting non-commercial speech placed on billboards.

The regulation of billboards is controlled by *Metromedia*, as "the law of billboards" is "a law unto itself." *Metromedia*, 453 U.S. at 501; *see Ackerly*

---

[13] In *Thomas*, the Supreme Court upheld a permitting scheme whereby "the object of the permit system (*as plainly indicated by the permissible grounds for permit denial*) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of . . . facilities, to prevent uses that are dangerous, unlawful, or impermissible . . . and to assure financial accountability for damage caused by the [applicant]." *Thomas*, 534 U.S. at 322 (emphasis added). The ordinance set forth eleven numbered grounds under which a permit could be denied, including: "the application for permit contains a material falsehood or misrepresentation," "the applicant has not tendered the required application fee," "the applicant . . . has on prior occasions damaged . . . property [for which a permit was granted]," and "the use or activity intended by the applicant would present an unreasonable danger to the health or safety of the applicant or . . . the public." *Id.* at 319 n.1. In the instant case, the County should adopt similar content-neutral bases for which the County Administrator may deny a permit, so that it is clear that the object of the permitting scheme is not to exclude communication of a particular type of content. *See also Atlanta Journal and Constitution*, 322 F.3d at 1311 ("The official charged with administering the Plan should have clear standards by which to accept or reject a [permit] request . . . . Perhaps a first-come, first-served system, a lottery system, or a system in which each [applicant] is limited to a percentage of available [mediums of expression] would be appropriate vehicles for limiting the official's discretion. We leave the intricacies of the safeguards to the Department . . . .").

*Communications v. Krochalis*, 108 F.3d 1095, 1099 (9th Cir. 1997) ("*Metromedia* continues to control the regulation of billboards"). *Metromedia* instructs courts to employ one of two distinct analytical frameworks, depending on whether the restriction is of commercial or noncommercial speech. *See Metromedia*, 453 U.S. at 504-05.[14] Ordinance 99-51 distinguishes between commercial and noncommercial speech, thereby taking this case out of the realm of regulations of purely commercial speech.

With respect to restrictions placed on noncommercial speech, the County argues that our inquiry should be confined to whether its Ordinance discriminates based on viewpoint. In striking down the portion of San Diego's sign ordinance that favored commercial over noncommercial speech, however, the *Metromedia* plurality explicitly rejected a strictly viewpoint-based analysis, holding that the First Amendment not only prevents the government from distinguishing between different viewpoints but also from distinguishing between broad categories or

---

[14] With respect to restrictions on purely commercial speech, the *Metromedia* plurality applied a four-part test: "(1) The First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading. A restriction on otherwise protected commercial speech is valid only if it (2) seeks to implement a substantial governmental interest, (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective." *Metromedia*, 453 U.S. at 507 (quoting *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 563-66 (1980)).

21

types of speech. *See Metromedia*, 453 U.S. at 519.[15] Because the *Metromedia* decision controls "the law of billboards," we will apply the analytical framework employed by the *Metromedia* plurality.[16]

Consistent with *Metromedia*, we first ask whether Ordinance 99-51 is a valid, content-neutral time, place, and manner regulation. This is the test employed by the Café district court.[17] In order to be constitutional, a time, place,

---

[15] In *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530 (1980), the Supreme Court declared, "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic. As a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Consol. Edison*, 447 U.S. at 537. Based on this language, the County's reliance on *Messer v. City of Douglasville, Ga.*, 975 F.2d 1505 (11th Cir. 1992), is misplaced. In that case, the sole issue was "whether a regulation allowing onsite *noncommercial* signs while denying offsite *noncommercial* signs would be constitutionally permissible." *Messer*, 975 F.2d at 1509 (emphasis added). Because the *type* of sign at issue was the same whether onsite or offsite (noncommercial vs. noncommercial), in considering whether the ordinance was content-based, the court only considered whether viewpoint discrimination existed. This case, however, deals with discrimination between commercial and noncommercial messages, making viewpoint analysis only part of the content-based inquiry.

[16] The County argues that the proper test is that applied in *United States v. O'Brien*, 391 U.S. 367 (1968). However, this framework cannot be applied to Ordinance 99-51. *O'Brien* involved a law that "on its face deals with *conduct* having no connection with speech," while *Metromedia* dealt with "the law of billboards." *Compare O'Brien*, 391 U.S. at 375 (emphasis added) *with Metromedia*, 453 U.S. at 501. As this Court recently noted, *O'Brien* has generally been applied only when "evaluat[ing] regulations of expressive conduct – conduct that contains both 'speech' and 'nonspeech' elements," such as nude dancing. *See Lady J. Lingerie*, 176 F.3d at 1364 (citing *O'Brien*, 391 U.S. at 376).

[17] The district court in *St. Johns County v. Café Erotica of Florida, Inc.* first applied time, place, and manner analysis, but then found that because Ordinance 99-51 singled out political speech for different treatment, the County would have to justify this disparate treatment under a strict scrutiny standard. We believe this is the correct analytical framework.

and manner regulation may not be based upon the content of the regulated speech, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternative channels for communication of the information. *See Rock Against Racism*, 491 U.S. at 791.[18] If the regulation is deemed content-based, however, our inquiry becomes more exacting, as we then apply strict scrutiny. *See Consol. Edison*, 447 U.S. at 536; *One World One Family Now v. City of Miami Beach*, 175 F.3d 1282, 1286 (11th Cir. 1999). Under strict scrutiny, the government must show that the regulation is narrowly tailored to serve a compelling state interest. *One World One Family Now*, 175 F.3d at 1286.

Thus, we must now determine whether Ordinance 99-51 is content-based. *Metromedia* held that discriminating *among* political messages is not always required for an ordinance to be deemed content-based. *See Metromedia*, 453 U.S. at 519. Rather, discriminating in favor of commercial messages over political ones, without regard to the actual messages conveyed, is also content-based discrimination. *See id.* at 513. Our inquiry therefore becomes whether Ordinance 99-51 in fact favors commercial messages over political ones.

_____

[18] In *Rock Against Racism*, the regulated concert venue was open to all performers, was regulated to control its noise level, and was deemed a public forum, thereby requiring analysis as a time, place, and manner regulation. *Rock Against Racism*, 491 U.S. at 790.

VII.     DISTINCTION FAVORING COMMERCIAL OVER NON-COMMERCIAL SPEECH IS CONTENT-BASED

St. Johns County argues that the Ordinance does not favor commercial speech over political messages because under its reading of LDC § 12.01.00 (defining "billboards"), any speech, including political messages, can be placed on billboards.[19]  Under the County's argument, the Ordinance simply provides an additional, superfluous provision regarding "political message signs."

While the County's interpretation is entitled to deference, *Southlake Prop. Assocs. v. City of Morrow*, 112 F.3d 1114, 1119 (11th Cir. 1997), we need only defer to the County's interpretation when that interpretation is "based on a permissible construction of the ordinance." *Id.*  However, the County's interpretation effectively rewrites the Ordinance by completely disregarding certain Ordinance provisions and is flawed for several additional reasons.

First, the County disregards the plain fact that the Ordinance limits "political message signs" to thirty-two square feet.  Significantly, Ordinance 99-51 defines "political message signs" as "[*a*]*ny* Sign containing a non-commercial opinion or endorsement message and not containing a commercial message,"

---

[19] But note that under Ordinance 99-51, "political message signs" can be no larger than thirty-two square feet, while billboards can be as large as 560 square feet. *See* LDC §§ 7.03.01(L), 7.01.03(A).

24

which by its terms encapsulates all signs carrying a non-commercial message, and then restricts such signs to sizes far below that allowed for billboards. *See In re Gosman*, 282 B.R. 45, 49 (Bankr. S.D.Fla. 2002) ("'Any' does not refer to certain things and not others. 'Any' means 'every' and 'all.' It is unlimited."); *see also* LDC § 12.00.00. Further, the definition of "billboard" makes no mention of "non-commercial" signs. LDC § 12.00.00. Thus, the County's interpretation disregards the plain language of the Ordinance.[20] If the County truly intended political and commercial messages to be on equal footing, the County would not have regulated the size of "political message signs" separately. The separate size limitation cannot be ignored as superfluous. This conclusion is supported by multiple canons of interpretation. *See, e.g., Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("courts should disfavor interpretations of statutes that render language superfluous"); *United States v. Louwsma*, 970 F.2d 797, 799 (11th Cir. 1992) ("a precisely drawn statute dealing with a specific subject controls over a statute covering a more generalized spectrum").

---

[20] The Café district court also hesitated to uphold an ordinance containing such internal inconsistencies, stating that "the Code . . . creates an internal confusion in that if the County Administrator determines that a sign contains 'political message' speech, its size must be limited to thirty-two square feet. On the other hand, [under the County's interpretation] off-premise billboards and on-premise signs can apparently *also* include political speech, and could be as large as 560 square feet . . . . The County offers no explanation for this confusion." *Café Erotica of Florida, Inc. v. St. Johns County*, No. 98-005597 CV-J-21-HTS, at 18 (M.D. Fla. Dec. 4, 2002) (order granting summary judgment).

Second, the County's interpretation, which would allow purely political messages to be displayed on billboards, is inconsistent with LDC § 7.03.01(L). Section 7.03.01(L) states in its entirety, "political message signs [are] limited to thirty-two (32) square feet, *except those in residential districts which shall not exceed six (6) square feet.*" (emphasis added). If the County actually intended for billboards to carry political messages, the County would have presumably included a second exception stating, "and except those on billboards which shall not exceed 378 square feet." This inference is supported by the maxim *expressio unius est exclusio alterius*, "expressing one item of an associated group or series excludes another left unmentioned." *See Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)).

Third, the County's interpretation cannot be reconciled with LDC § 7.01.03(G), which states, "[a]ll billboards . . . within the County shall . . . have displayed on them [] the [o]wner's name information displayed in such a manner as to provide clear readable visibility from the abutting road right-of-way during daylight hours." The minimum space allowable between the billboard and the right-of-way is generally fifteen feet, but it can be up to six hundred feet along certain highways. A review of Café Erotica's billboards reveals that this display requirement means that the corporation's complete legal name must prominently

26

appear on the billboard facing. *See* LDC §§ 7.01.04(A), 7.01.04(E)6. Such a requirement makes sense for commercial messages, but not for political ones. Under the County's interpretation of Ordinance 99-51, a sign displaying the message "Vote for John Smith" would also have to include the words "Café Erotica / We Dare to Bare / Adult Toys / Great Food / Exit 94, Inc." in similar bold print. Such an interpretation is inconsistent with the Supreme Court's direction that "an author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995). However, we should construe ambiguities in a manner that avoids constitutional questions. *See Southlake Prop. Assocs.*, 112 F.3d at 1119.

Finally, the County's interpretation of Ordinance 99-51 gives the Administrator unbridled power to discriminate *between* political messages as he sees fit. On the one hand, the County believes that political messages may in fact be displayed on billboards. On the other hand, the County also concedes that "political message signs" carry greater size restrictions and are defined as "*[a]ny Sign* containing a non-commercial opinion or endorsement message and not containing a commercial message." LDC § 12.01.00 (emphasis added). With these two provisions in place, the County has created a handy tool for

27

discriminating based on content. Presumably, if the County Administrator disagrees with the applicant's likely message, then the County can utilize its "political message sign" tool and thereby restrict the sign to thirty-two square feet. Such a restriction would be entirely permissible under the Ordinance as written. *See* LDC § 12.01.00. If, on the other hand, the County Administrator reviews an application from an organization he agrees with ideologically, then the County can invoke its seemingly inclusive definition of "billboards" and allow that particular political message to be displayed much more prominently.[21] In this way, the County can effectively discriminate between political messages based solely upon political content, which the County cannot do absent compelling reasons. *See Fly Fish*, 337 F.3d at 1306 (quoting *Rock Against Racism*, 491 U.S. at 791) (a law that "suppresses protected speech because of disagreement with the message it conveys . . . violates the First Amendment, absent some compelling state interest in its enforcement").

The County contends that the Administrator is never given the opportunity to determine whether a sign contains political speech because the permit

---

[21] We note that Billboards are defined as signs "over thirty-two (32) square feet in size that [are] used for off-premise outdoor advertising and display," and they also include on-premise signs that exceed 300 square feet. LDC § 12.01.00. An "Advertising Message" is defined to include not only commercial messages, but also "political copy intended to directly or indirectly promote a candidate or issue." LDC § 12.01.00.

28

application does not require information regarding the message. However, the County needs information regarding, at a minimum, the type of proposed message in order to determine the appropriate sign category, which in turn determines the sign's allowable size and location. Further, while it is true that the permit application does not require information regarding the proposed message, the County can often infer the content based on the nature of the applicant's business. In this case, for example, there is a long history of conflict between Café Erotica and St. Johns County. Thus, any permit application submitted by Café Erotica could be denied simply because of the perceived danger of the sign's possible political message or because of the undesirability of the applicant's business – adult entertainment. Without discretion-checking guidelines, there is a distinct possibility that the County could decline to issue Café Erotica a permit based on content. *See, e.g., Lakewood*, 486 U.S. at 759-60 (a licensing scheme where "the licensor does not necessarily view the text of the words about to be spoken, but can measure their probable content or viewpoint by speech already uttered . . . is sufficiently threatening to invite judicial concern.") (internal citations omitted).

Having determined that Ordinance 99-51 does in fact distinguish based on content – both by allowing commercial messages to be displayed more prominently than political messages and by giving the County Administrator the

29

unchecked ability to discriminate between political messages, we now turn to

*Metromedia* in order to determine whether such restrictions are nevertheless

constitutional.[22]

## VIII.    *METROMEDIA* APPLIED

In *Metromedia*, the United States Supreme Court struck down San Diego's

ordinance generally banning the erection of off-premise outdoor advertising

displays,[23] including billboards.  The ordinance provided two exceptions to the

general prohibition: onsite signs[24] and signs falling within one of twelve specified

categories.[25]  Thus, onsite commercial advertisements were permitted, but offsite

---

[22]  The district court also found that the provision for bringing appeals underscores the very real possibility of content-based decision-making because it states that in any case "where the message or content of the proposed sign affected the denial of the permit," the County must bear the burden of justifying the denial.  The very enactment of such a provision appears to admit the possibility of content-based decisionmaking, which is the real concern of our First Amendment jurisprudence.  *See Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

[23] The San Diego ordinance generally prohibited the following signs: (1) any sign identifying a use, facility or service which is not located on the premises; (2) any sign identifying a product which is not produced, sold or manufactured on the premises; and (3) any sign which advertises a product, service or activity, event, person, institution or business which occurs or is conducted, sold, manufactured, produced or offered elsewhere than on the premises where such sign is located.  *Metromedia*, 453 U.S. at 494 n.1.

[24] Onsite signs are defined under the ordinance as those "designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed."  *Metromedia*, 453 U.S. at 494.

[25] The specific categories exempted from the prohibition included: government signs; signs located at public bus stops; signs manufactured, transported, or stored within the city, if not used for advertising purposes; commemorative historical plaques; religious symbols; signs within

commercial advertising and political messages on billboards were generally

forbidden. The actual restriction on outdoor signs was defined by reference to the

structural characteristics of the sign, but also by reference to the sign's content.

Specifically, the regulation only applied to a "permanent structure . . . used for the

display of [] a commercial or other advertisement to the public." *Id.* at 503.

Companies engaged in the business of outdoor advertising challenged the San

Diego ordinance as facially invalid.

The *Metromedia* Court made two distinct rulings. First, with respect to the

limits placed on purely commercial speech, the Court ruled that off-site

commercial billboards may be prohibited while on-site commercial billboards are

not. *Id.* at 512 (applying four-part *Central Hudson* test for restrictions on

commercial speech). Second, the *Metromedia* Court struck down the portion of

the San Diego ordinance that banned billboards displaying political messages.

The Court held:

> [O]ur recent commercial speech cases have consistently accorded
> noncommercial speech a greater degree of protection than commercial
> speech. San Diego effectively inverts this judgment, by affording a
> greater degree of protection to commercial than to noncommercial
> speech. . . . The use of onsite billboards to carry commercial messages

---

shopping malls; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature, and news; approved temporary, off-premises, subdivision directional signs; and temporary political campaign signs. *See Metromedia*, 453 U.S. at 494-95.

related to the commercial use of the premises is freely permitted, but the use of otherwise identical billboards to carry noncommercial messages is generally prohibited. The city does not explain how or why noncommercial billboards located in places where commercial billboards are permitted would be more threatening to safe driving or would detract more from the beauty of the city. Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages.

*Metromedia*, 453 U.S. at 513.

The same impermissible preferences that the Supreme Court found unconstitutional in *Metromedia* are also present here, but in a different form. In *Metromedia*, the provision struck down allowed all onsite commercial billboards, but almost completely banned similar noncommercial signs. The instant case involves a similar unconstitutional preference, but in the form of greater size restrictions for noncommercial messages vis-á-vis commercial ones. While Ordinance 99-51 does not involve a *complete* ban on political speech, neither did the *Metromedia* ordinance, as it provided several exemptions from the permitting requirements for certain noncommercial speech. Just as in *Metromedia*, "the [County] may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." *Id.* at 513. By limiting the size of political messages to roughly 1/17 that of commercial ones, that is

32

precisely what the County has done. Because of its preference for commercial speech, the *Metromedia* Court struck down the San Diego ordinance as unconstitutional on its face. *See Metromedia*, 453 U.S. at 521. We must do the same, unless the County can satisfy the requirements of strict scrutiny.

Because Ordinance 99-51 discriminates against political speech in favor of commercial speech, the County must provide compelling reasons for this disparate treatment that are narrowly tailored to further those interests. *See Metromedia*, 453 U.S. at 516-17; *see also Consol. Edison*, 447 U.S. at 540. The County's stated goals are to protect the safety and aesthetic interests of its citizens. The County argues that its Ordinance is of no greater restraint on speech than is necessary to protect those interests. The goals of safety and aesthetics are no doubt "substantial."[26] However, while size limitations may be justified for *all signs* based on safety and aesthetics, these interests cannot justify allowing billboards to be built up to 560 square feet while allowing a maximum of only thirty-two square feet for political message signs. The Ordinance contains no findings of fact suggesting that political speech distracts motorists more than commercial

---

[26] The Supreme Court in *Metromedia* ruled that there could not be "substantial doubt that the twin goals [of] traffic safety and the appearance of the city [] are substantial governmental goals." *Metromedia*, 453 U.S. at 507-08. Because we find that Ordinance 99-51 is not narrowly tailored, we need not determine whether the interests of safety and aesthetics are "compelling."

33

messages or that political signs are more aesthetically displeasing than commercial advertisements. In short, "safety" and "aesthetics" are not truly furthered by an ordinance that allows one small, "safe," and visually pleasant political sign to be placed adjacent to a large, "unsafe," and aesthetically displeasing commercial billboard.

We also find the County's argument unpersuasive for the reasons stated in *Metromedia*, which declared, "by allowing commercial establishments to use billboards to advertise the products and services they offer, the city necessarily has conceded that some communicative interests, *e.g.*, onsite commercial advertising, are stronger than its competing interests in esthetics and traffic safety. It has nevertheless banned all noncommercial signs except those specifically excepted." *Id*. at 520. Like the city of San Diego, St. Johns County has conceded that allowing a certain number of billboards outweighs its interests in aesthetics and safety; however, the County favors commercial messages over political ones by allowing commercial messages to be displayed more prominently. This amounts to an unconstitutional preference for commercial speech over political speech. *See id*. at 513 n.18. The County can achieve its goals simply by mandating that all messages, whether political or commercial, be limited to the same size. *See Consol. Edison*, 447 U.S. at 542 n.11.

34

Because we find that Ordinance 99-51 makes unconstitutional content-based distinctions, we need not consider whether alternative channels are available for the regulated speech. *See Consol. Edison*, 447 U.S. at 541 n.10.

IX.    SEVERANCE: THE DISTRICT COURT PROPERLY REFUSED TO SEVER THE POLITICAL MESSAGE PROVISIONS

Ordinance 99-51 contains a severability provision.  However, the Café district court ruled that it could not sever the unconstitutional provisions of Ordinance 99-51 and still be left with a workable statute.  The district court noted the two competing policies at stake, that "the Court must make every *reasonable* construction of the Ordinance to save it from unconstitutionality; at the same time, the Court will not re-write an ordinance [because this is] a function that is within the province of the County." *Café Erotica of Florida, Inc. v. St. Johns County*, No. 98-005597 CV-J-21-HTS, at 26 (M.D. Fla. Dec. 4, 2002) (order granting summary judgment).  The district court also recognized that Florida law requires it to sever any provisions of the Ordinance that it finds unconstitutional, while allowing valid portions to stand, *but only if* problematic provisions "can be distinguished and clearly separated" from the remainder. *See Lysaght v. City of New Smyrna Beach*, 159 So.2d 869, 870 (Fla. 1964).

We also find that severance is inappropriate.  The interests of federalism

35

and comity dictate conservatism to federal courts in imposing their interpretative views on state statutes. *See National Adver. Co. v. Town of Niagara*, 942 F.2d 145, 151 (2d Cir. 1991). We agree with the County that the provision separately regulating "political message signs" is easily severable. However, severance of just this one provision will not address our concerns with the Administrator's unfettered discretion. Therefore, we affirm the district courts' decision in striking down the entire St. Johns County sign Ordinance, codified as Article VII of the St. Johns County LDC.

## X. CONCLUSION

We reverse the district courts' ruling that § 7.00.01[27] and § 7.00.08[28] are facially unconstitutional. We affirm the district courts' ruling that § 7.03.01[29] of Ordinance 99-51 is facially unconstitutional and cannot be severed from the rest of Article VII of the LDC. We also hold that the lack of specific guidelines needed to limit the discretion of the County Administrator creates an unconstitutional prior restraint on speech.

---

[27] Setting forth the time limits in which St. Johns County must approve or deny a sign permit.

[28] Describing the appeals process and time limits for challenging a permit denial.

[29] Setting forth the requirements for "special use signs," including limiting "political message signs" to thirty-two square feet generally and six square feet in residential districts.

Finding severance inappropriate under these circumstances, we strike down

Article VII of the St. Johns County LDC in its entirety. Because we find

Ordinance 99-51 unconstitutional on its face, we need not determine whether

Ordinance 99-51 is unconstitutional as applied to the appellees.

**AFFIRMED** in part, and **REVERSED** in part.

KRAVITCH, concurring in part, dissenting in part:

The majority holds that the St. John's County Ordinance runs afoul of the First Amendment in two separate ways. First, the ordinance creates an unacceptable prior restraint on speech by placing too much discretion in the county administrators in accepting or rejecting sign licenses. Second, the ordinance favors commercial over non-commercial speech, thereby, disfavoring core political speech. Although I agree with the legal standards announced in the majority opinion, I disagree, in part, with the application of these standards to the ordinance at issue here. Specifically, in my view, the ordinance establishes sufficiently explicit and objective standards for reviewing sign applications and thus does not vest administrators with unbridled discretion. In addition, the ordinance provides less protection for non-commercial speech only with regard to on-premise signs. Therefore, I respectfully concur only in part with the majority's holding.

I. Prior Restraint Analysis

As the majority correctly states, county administrators may not have unbridled discretion to determine who can announce their commercial and non-commercial viewpoints. See City of Lakewood v. Plain Dealer Publ'g Co., 486

38

U.S. 750, 108 S.Ct. 2138, 100 L.Ed. 2d 771 (1988). For instance, in City of Lakewood, the Supreme Court determined that a city plan, which allowed the mayor to determine unilaterally which newspapers could place newsracks on city streets and only required him to provide a reason for any denials, was an impermissible prior restraint because it vested too much discretion with the mayor. Id. at 753-60, 108 S.Ct. at 2142-46. There, the Supreme Court required "that the city establish neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered." Id. at 760, 108 S.Ct. at 2146.

Here, St. John's County has established neutral criteria for making its licensing decisions. The sign code is extensive and regulates the number, size, and construction of signs. The county has a legitimate state interest in regulating signs for traffic, safety, and aesthetic reasons, and, thus, it can establish a licensing procedure that limits the signs on these bases. See Metromedia v. City of San Diego, 453 U.S. 490, 502-03, 101 S.Ct. 2882, 2889-90, 69 L.Ed.2d 800 (1981). In addition, the county administrator must provide a written copy of the his decision, if requested, and the decision then can be appealed. See § 7.00.07. Both of these factors distinguish the St. John's County's ordinance from the one challenged in Lakewood.

The majority determines that there is the potential for content-based discrimination with regard to political message signs and on-premise signs, and that this creates a prior restraint problem. Although I agree that St. John's County makes an impermissible distinction between commercial and non-commercial speech when regulating on-premise signs, I do not agree that this is a prior restraint issue. The process for receiving a sign permit is explained in detail, based on objective factors, and open to judicial review. In fact, the criteria are announced clearly enough for this court to rule on the substance of the code based on the face of the ordinance.

Moreover, this court has held that county regulations that address the number, size and construction of outdoor signs are permissible. See Granite State Outdoor Advertising, Inc. v. City of Petersburg, 348 F.3d 1278, 1282 (11th Cir. 2003). There, the city also drew distinctions between on-premise and off-premise advertising. The distinction in the ordinance required the city examiner to review the content of any proposed sign to determine if it met the ordinance's requirements, although the city claimed that the review was not for viewpoint. Id. at 1282, n.3. Nonetheless, the court found that such minimal content based distinctions did not make the provision an impermissible prior restraint. Id. at 1282. The existence of a content review, in itself, did not vest administrators with

unbridled discretion because the review was based on objective factors. Here, we review a similar sign regulation procedure. Although the ordinance may infringe on first amendment protections by making impermissible distinction between types of speech, it does not vest administrators with too much discretion.[1]

## II. Content Based Distinctions

I agree with the majority that St. John's County may not favor commercial messages over political messages. See Metromedia, 453 U.S. at 513, 101 S.Ct. at 2895. However, I partly disagree that the ordinance challenged here does so. The

---

[1] The majority notes that the ordinance's process is not content-neutral because the appeal's procedure required the County to make content-based decisions. Section 7.00.08. states that:

> In any case where the message or content of the proposed Sign affected the denial of the permit, the County shall bear the cost of initiating the case with the Circuit Court and shall also bear the burden of justifying the denial. In all other cases, the applicant shall have the burden to initiate the Circuit Court appeal, as provided by law.

Although this provision demands a content-based analysis, it is not an impermissible prior restraint. First, there is not a Metromedia violation because commercial speech is not advantaged over non-commercial speech. Rather, the provision establishes a preference for "core" speech by making the county bear the burden of proof and costs of initiating cases in circuit court if a denial is based on the content of the message. Second, in Freedman v. Maryland, the Supreme Court required municipalities to "bear the burden of going to court to suppress speech and must bear the burden of proof once in court." FW/PBS v. City of Dallas, 493 U.S. 215, 227 (1990) (citing Freeman, 380 U.S. 51, 58-60, 85 S.Ct. 734, 738-40 (1965)). The county was most likely attempting to write its code to meet this Freedman requirement.

majority determines that the county's ordinance favors commercial speech for two reasons: first, political speech is limited to signs no more than 32 square feet but that commercial speech can be placed on larger billboards; and second, the ordinance prohibits political speech from being posted on an "on-premise" sign. I disagree that the St. John's County ordinance does the former, but agree that it does the latter.

On the first point, the plain text of the St. John's ordinance permits both commercial and political messages on billboards, which can be as large as 560 square feet. Section 7.01.03 regulates the size of billboards and contains no reference to the content. Section 7.03.01, by contrast, regulates special use signs. That section does not apply to billboards and *expands* the areas where political signs may be placed. That section states, in relevant part:

> The following Signs shall be allowed *in addition* to other Signs allowed by this Code and are subject to the provisions contained herein and violation of these provisions shall result in a violation of this Code....
> L. Political Message Signs, limited to thirty-two square feet, except those in residential districts which shall not exceed six (6) square feet.

(Emphasis added).

The majority concludes that this section limits political message signs to thirty-two square feet, a size much smaller than the 560 square feet permitted for

42

billboards. The most natural reading of the ordinance, however, leads to a different interpretation. Billboards, as large as 560 square feet, may contain political *or* commercial messages under § 7.01.03. Other signs bearing political messages are allowed *in addition* to billboards, but are limited to 32 square feet under § 7.03.01. In short, the political message signs provision in § 7.03.01 does not limit the size of political messages on billboards, but simply permits signs other than billboards. If residents of St. John's County wish to publicize political views, they can do so on a 560 square foot billboard or on smaller signs in residential areas.

On the second point, I agree with the majority that the county's ordinance favors commercial speech over political speech in regulating on-premise signs. Here, the county restricts non-commercial speech where it permits commercial speech, and, thereby, provides less protection to "core" speech in violation of the Metromedia rule. For the above reasons, I concur in part and dissent in part with the majority opinion.