[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11952
_____

D.C. Docket No. 4:15-cv-00055-HLM

JIM BARRETT,

Plaintiff - Appellee,

versus

WALKER COUNTY SCHOOL DISTRICT;
MR. DAMON RAINES,
in his official and individual capacities;
MR. MIKE CARRUTH,
in his official capacity;

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(October 2, 2017)

Before ROSENBAUM, JULIE CARNES, and GILMAN,[*] Circuit Judges.

ROSENBAUM, Circuit Judge:

Control the clock and control the game.  Winning coaches in many sports have employed this strategy.[1]  And Plaintiff-Appellee Jim Barrett asserts that the lesson wasn't lost on Defendant-Appellant Walker County School District, either. To speak at a Walker County Board of Education meeting, the District requires a member of the public to first go through a process that can consist of several steps. If the entire process is not completed at least one week before the Board meeting, the citizen may not speak at the meeting.  Yet critically, the Board completely controls the timing of a step at the beginning of the process.  If the Board drags its feet in completing this step, a member of the public cannot finish the rest of the steps in time to be permitted to speak.

Barrett is a public-school teacher who believes that the District has wielded this policy to unconstitutionally censor speech critical of the Board and its

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] The legendary basketball coach Dean Smith was famous for, among other things, his Four Corners offense, a strategy all about controlling the clock. *Dean Smith Dies at Age of 83*, ESPN.com (Feb. 12, 2015), http://www.espn.com/mens-college-basketball/story/_/id/12296176/dean-smith-former-north-carolina-tar-heels-coach-dies-age-83 ("Smith's Four Corners time-melting offense led to the creation of the shot clock to counter it.").  During his 36 seasons coaching basketball at the University of North Carolina in Chapel Hill, Coach Smith amassed a .776 winning percentage that included eleven Final Four appearances, two national championships, seventeen ACC regular-season titles, and thirteen ACC tournament titles.  *Id.* When Coach Smith passed away, the Tar Heels paid tribute to him by running his Four Corners offense in their first offensive possession in the game following his death. *UNC Honors Dean Smith by Running Four Corners Offense*, SportsIllustrated.com (Feb. 21, 2015), https://www.si.com/college-basketball/2015/02/21/dean-smith-unc-four-corners-tar-heels.

employees at school-board meetings. He filed suit in federal court, asserting a variety of First Amendment facial and as-applied claims in his quest for, among other things, an injunction against various aspects of the Board's policy governing public comment at its meetings.

The district court ultimately granted Barrett a permanent injunction based on some of his facial claims and enjoined the Board's public-comment policy. It also allowed a number of Barrett's other claims to proceed to discovery.

Defendants now appeal the injunction. We have appellate jurisdiction under 28 U.S.C. § 1292(a)(1), which allows us to review "[i]nterlocutory orders . . . granting . . . injunctions." After careful review, and with the benefit of oral argument, we affirm in part, vacate in part, and remand for further proceedings.

## I.

### A.[2]

According to his verified complaint, Barrett is employed by the District as a seventh- and eighth-grade social-studies teacher. He is also the president of the Walker County Association of Educators ("WCAE").

The District is managed by the Walker County Board of Education, which itself is composed of five elected officials. One of those officials, Defendant Mike

---

[2] As we explain later, we assess Barrett's standing as a matter of fact and not merely based on the pleadings. For that reason, in this section, we provide the factual circumstances relating to the issue of Barrett's standing based on the record as it had been developed by the parties as of the entry of partial summary judgment.

Carruth, is the Chairperson of the Board; in that capacity, he presides over Board meetings, signs documents on behalf of the Board, and performs other duties. Defendant Damon Raines is the Superintendent of the District, a job that makes him responsible for all operations of the District, including the implementation of District policies and procedures.

Except in January and February, the Board holds a meeting every month. The Board also holds a planning session each month. Members of the public are allowed to comment at the meetings and planning sessions. In advance of each meeting or planning session, the Board publishes an agenda of items to be discussed, and the agenda indicates the time allotted for public comment. The Board has a policy that governs how members of the public may obtain permission to speak during these public-comment sessions (the "Policy").

Barrett is no stranger to the public-comment sessions of Board meetings: according to his complaint, he "has publicly participated in Board meetings in the past by endorsing actions of the Board, commending the Board on past actions and recognizing employees of the Board for good deeds." And he contends that, despite the existence of the Policy, he "has not been subjected to the procedural requirements of [the Policy] prior to making such public comments."

But Barrett asserts that the Board's tune changed when Barrett's comments began to strike the wrong chord with the Board: Barrett contends that the Board

4

started requiring him to comply with the Policy only when he started speaking critically of the Board.

Barrett's litigation saga begins with a topic controversial in any school: grades. In the period from May 2014 to January 2015, Barrett became a "vocal critic" of new grading procedures that the Superintendent had implemented without the Board's having taken any official action. As Barrett saw things, this new grading policy negatively affected student performance and teacher-performance evaluations.

So in his capacity as President of WCAE, Barrett publicly criticized the grading policy during meetings of WCAE and during in-person discussions with the Superintendent. According to Barrett, he had "several discussions with Superintendent Raines on this topic" during which the Superintendent "vehemently disagreed with Mr. Barrett about the impact of his new procedures" and "often became agitated and upset with Mr. Barrett for his attempts to raise this issue with the Board and in public."

Barrett eventually took the issue of the grading policy to the membership of WCAE, and "the organization agreed to publicly speak against the new grading policy." The Board meeting scheduled for February 17, 2015, presented "the first opportunity for WCAE to speak to the Board in opposition to the policy." So

Barrett set out to obtain permission from the Board to speak during the public-comment session of that meeting.

To comply with the Policy, Barrett e-mailed the Superintendent on January 20, 2015, "requesting to meet with [the Superintendent] in order to speak with the [Board] at its next Planning Session with respect to matters of school/district administration." The Superintendent responded that he was "available" eight days later, "on Wednesday, January 28." Barrett and the Superintendent met on the agreed-upon day, and Barrett "presented his concerns in writing and requested the process to be completed so that he could appear at the February Board meeting."

After the meeting, Barrett followed up with the Superintendent by e-mail, asking that the Superintendent respond in writing to Barrett's written concerns. The Superintendent replied by e-mail on February 4, stating that he would "have written documentation prepared addressing the concerns" and that he would "deliver [the documentation] on Monday, February 9."

Barrett and the Superintendent met for about an hour on February 9. The Superintendent gave Barrett four single-spaced written pages in response to Barrett's previously raised concerns, and the two discussed the results of the Superintendent's investigation. As Barrett tells the story, "The Superintendent expressed his dissatisfaction with Mr. Barrett's views on the issues and Mr.

Barrett's efforts to speak to the Board about education policy issues that were critical of actions taken by [the District] and the Superintendent."

Immediately after the meeting, Barrett mailed a letter to the Superintendent. The letter, dated February 9, asked that the Superintendent "accept th[e] letter as [Barrett's] written request to speak at the February 16, 2015 regular meeting of the Walker County Board of Education." Barrett explained in the letter that he wished to speak about the new grading policy and three other topics.

Two days later, on February 11, 2015, Barrett received a letter from the Superintendent postmarked February 11. The letter noted that, on February 11, the Superintendent received Barrett's request to speak. This, the letter explained, was too late under the Policy for Barrett to be permitted to speak at the Board's February 17 meeting. The letter further indicated that the Board agenda for the February 17 meeting would not include a public-comment session. Nevertheless, the Superintendent's letter did state that the Superintendent was "happy to place [Barrett's] name on the agenda under public participation at the Board planning session scheduled for Tuesday, March 10, 2015."

Barrett did not attend the March 10 planning session. Timing was critical for Barrett, because in anticipation of the February 17 meeting, he "had organized a large number of employees of the [District] to appear at the Board meeting to show their dissatisfaction with the switch in grading procedures implemented by

the Superintendent." Barrett asserts that the Superintendent, who knew of Barrett's association with WCAE, decided "to deny Barrett's request and to cancel all public comment at the February 17, 2015 Board meeting . . . for viewpoint-specific reasons related to Mr. Barrett, and the association he represents, and their critical views of the actions taken with respect to the switch in grading procedures."

Despite this setback, Barrett states that he "seeks to speak to the Board in the future about timely matters, often in a manner critical of Defendants." Barrett is concerned, however, that Defendants "will often bar his speech by refusing to place him on [a] meeting agenda."

## B.[3]

The Policy states, in relevant part,

Meetings of [the Board] are held to conduct the affairs and business of the school system. Although these meetings are not meetings of the public, the public is invited to attend all meetings and members of the public are invited to address the Board at appropriate times and in accordance with procedures established by the Board or the Superintendent.

The Superintendent shall make available procedures allowing members of the public to address the Board on issues of concern. These procedures shall be available at the Superintendent's office and shall be given, upon request, to anyone requesting a copy.

---

[3] The only claim we address on appeal is Barrett's facial challenge to the Policy insofar as the Policy allegedly grants the Board unbridled discretion in violation of the Free Speech Clause of the First Amendment to the U.S. Constitution. Because the claim is a facial challenge, we concern ourselves only with the face of the Policy and the "Procedures" promulgated pursuant to the Policy.

8

Prior to making a request to be heard by the Board, individuals or organizations shall meet with the Superintendent and discuss their concerns.  If necessary, the Superintendent shall investigate their concerns, and within ten work days, report back to the individual or organization.  After meeting with the Superintendent, individuals or organizations still desiring to be heard by the Board shall make their written request to the Superintendent at least one week prior to the scheduled meeting of the Board stating name, address, purpose of request, and topic of speech.  Any individual having a complaint against any employee of the Board must present the complaint to the Superintendent for investigation.  The Board will not hear complaints against employees of the Board except in the manner provided for elsewhere in Board policies, procedures, and Georgia law.

All presentations to the Board are to be brief and are intended for the Board to hear comments or concerns without taking action.

The procedures ("Procedures") promulgated by the Superintendent under the Policy[4] provide, as pertinent here, as follows:

*Meetings of the [Board] are structured to allow the Board to conduct its public business.  Meetings of the Board are open to the public, but are not to be confused with public forums.  When time permits, the [Board] as a matter of general operating procedures offers an opportunity for citizens of the school district to address the Board in open session.*

The following rules shall be adhered to:

  1.  Refer to [the Policy] concerning required meeting with Superintendent.
  2.  After meeting with the Superintendent, individuals or organizations shall make written request to the Superintendent at least one week prior to the scheduled meeting of the Board.  Please include name, address, purpose of the request, and topic of speech.

---

[4] For ease of expression, and where appropriate, the term "Policy" includes the Policy and Procedures collectively.

9

3. Each person whose name is placed on the agenda will be given five (5) minutes to make their comments.
4. Where several citizens wish to address the same topic or issue, the Board reserves the right to limit discussions should they become repetitive.
5. While citizens may use their allotted time to take serious issue with Board decisions, the Board will not permit anyone to become personally abusive of individual Board members or Board employees.
6. When issues arise that stimulate high community interest, the Board may schedule special meetings specifically to invite public comment.  In those circumstances, the Board will establish special guidelines for participation.
7. The Board Chair may:
   a. Interrupt, notify, or terminate a participant's statement when the statement exceeds the prescribed time limit, is abusive or disruptive, is obscene, or is irrelevant to a subject under consideration; . . . if a speaker fails to follow these rules one time during a meeting, he or she loses the opportunity to continue to speak at the meeting.

   * * *

8. The Board will not respond to comments or questions posed by citizens in their presentations, but will take those comments and questions under advisement.

## II.

Barrett filed a complaint, together with a motion for a preliminary and consolidated permanent injunction, against the District, Carruth, and Raines.  In Count I of the complaint, Barrett requested a declaratory judgment, injunctive relief, and damages for Defendants' alleged violation of his rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated against the states under the Fourteenth Amendment, based on various facial and as-

10

applied challenges.  In Count II, Barrett sought a declaratory judgment, injunctive relief, and damages for Defendants' alleged violation of his rights under the Georgia Constitution based on essentially the same theories as those asserted in Count I.

In his motion for injunctive relief, Barrett asked the court to consolidate the grant of preliminary injunctive relief with the grant of permanent injunctive relief by way of a summary trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).  In support of his request, Barrett contended that no evidentiary hearing was warranted because the court could grant injunctive relief by ruling on those claims of his that did not require resolution of disputed facts, and his claims for damages could be resolved at a later trial.

While Barrett's motion was pending, the court, in accordance with the parties' request, stayed discovery until ten days after the court ruled on the motion. The court then stayed the entire case, again based on the parties' request, because the parties had been in settlement talks and expected that the case could be settled without the court's having to rule on Barrett's motion.  The potential settlement fell through.  But instead of ruling on the motion for injunctive relief, the court referred the case to the magistrate judge for mediation, which was likewise unfruitful.

11

Although Barrett's motion for injunctive relief was still pending and the parties had conducted no discovery, Barrett filed a motion in January 2016 for partial summary judgment. As relevant here, Barrett's motion sought a declaration that the Policy was facially unconstitutional as well as a permanent injunction against the enforcement of the Policy.[5] The motion also clarified that it was premised on only the argument that the Policy was facially unconstitutional, that it sought relief against only the District and against Raines in his official capacity, and that Barrett wanted all other claims (*i.e.*, the as-applied claims and the remaining claims against the individual defendants) to proceed through discovery.

In support, as relevant on appeal, Barrett contended that the Policy gave unbridled discretion to Raines.[6] He also notified the court that he "relie[d] on [only] those facts necessary to support this motion, specifically including Defendant's policy and procedure and the minimal facts necessary to support standing."

---

[5] Barrett also sought a finding that the District and Raines were liable to Barrett for damages, but he later conceded that the claims against Raines and Carruth in their official capacities should be dismissed as long as any injunction entered against the District applied to Raines and Carruth by virtue of their affiliation with the District. The district court therefore dismissed the claims against Raines and Carruth in their official capacities.

[6] He also complained that the Policy (1) was not content neutral or narrowly tailored and (2) improperly blocked spontaneous speech and speech on recently occurring matters. The district court agreed with Barrett on the first of these two contentions but not the second. As Barrett clarified at oral argument, he has chosen not to defend the district court's partial injunction as it relates to the first issue. We therefore vacate those aspects of the injunction and partial summary judgment without further discussion.

Barrett's filing of his motion for partial summary judgment prompted the court to deny without prejudice the motion for a preliminary and consolidated permanent injunction. Instead, the court directed the parties to brief the motion for partial summary judgment.

In response, Defendants filed a motion requesting that their time to respond to the motion for partial summary judgment be extended until thirty days after the close of discovery. As Defendants saw it, even though Barrett purported to limit his basis for summary judgment to his facial challenges to the Policy, Barrett nevertheless relied on information outside of the pleadings in support of his motion. Plus, Defendants filed this motion on January 29, and the stay on discovery was not set to lift until February 5. Because Defendants would have been required to respond to the motion for partial summary judgment well before the end of discovery, Defendants asked for the extension of time so that they could use the factual record that would be developed through discovery to respond to the factual contentions that Barrett asserted in his motion.

The district court denied Defendants' request for an extension of time, finding that Defendants had all the information they needed to respond to the arguments raised at that juncture. So Defendants later filed their response to Barrett's motion for partial summary judgment and their own cross-motion for partial summary judgment.

13

The district court granted in part Barrett's motion for partial summary judgment. At the beginning of its legal analysis, the court made clear that, consistent with the parties' motions, the court was addressing Barrett's facial challenges only—not his as-applied challenges. For that reason, the court explained that it would "not consider whether the Policy is unconstitutional as applied to Plaintiff or whether Plaintiff satisfied the Policy's requirements." As for the threshold issue of Barrett's standing, the court briefly found that, because the evidence showed that the Policy chilled his speech, Barrett had standing to pursue his facial claims.

Turning to the merits, as relevant on appeal, the district court first conducted a forum analysis and determined that the public-comment portions of the Board's meetings were limited public fora. It then found the Policy violated the unbridled-discretion doctrine: by not setting time limits on Raines's second meeting with individuals who wish to speak at a public-comment session, the district court concluded, the Policy gave Raines unbridled discretion to set that meeting at a time that would preclude the individuals from satisfying the remaining prerequisites for obtaining permission to speak. But the court did not address Barrett's argument that the Policy failed to impose a constitutionally required time limit on when Raines must schedule an initial—rather than a second—meeting.

14

The district court also found that Barrett easily established the elements for a permanent injunction.  So the court permanently enjoined the District, "as well as its agents, representatives, and employees, from enforcing the Policy."

As for matters of procedure, the court clarified that Barrett's as-applied claims, his claims against the individual defendants in their individual capacities, and his claims for damages remained pending and would proceed through discovery.

Defendants appeal, and we now consider whether the Policy granted the Superintendent unbridled discretion.  We also address Barrett's standing and the propriety of the district court's denial of Defendants' motion for extension of time.

## III.

We begin with the threshold issue of standing because if Barrett does not have standing to pursue his unbridled-discretion claim, then we do not have subject-matter jurisdiction over the claim.[7]  *See Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014).  We review questions of standing *de novo*.  *See id.* at 882.

---

[7] Although "[s]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (internal quotation marks and citations omitted), Barrett presently pursues, for purposes of this appeal, only his facial unbridled-discretion claim.  So we determine Barrett's standing with respect to that claim only.  On remand, Barrett's standing with respect to any other claims he may still pursue is for the district court to determine at the appropriate time and in the appropriate manner.

Our inquiry is simple in a case involving a facial challenge to a speech regulation based on a theory of unbridled discretion.  It is long-settled that "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988).  In other words, a plaintiff has standing to facially challenge a law that allegedly grants unbridled discretion as long as the plaintiff "is subject to" or "imminently will be subject to" that particular law.  *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1274 (11th Cir. 2006) (internal quotation marks omitted) (quoting *Lakewood*, 486 U.S. at 755).

In *CAMP*, for example, we held that a plaintiff had standing to challenge regulations that purportedly granted unbridled discretion to city officials because the plaintiff had applied for permits in the past and intended to apply for permits in the future, and those permit applications were or would be subject to the challenged regulations.  *See id.* at 1274-75.  We found that it made no difference that "city officials ha[d] not yet exercised their discretion to refuse [the plaintiff]'s [permit applications] . . . because it [wa]s the existence, not the imposition, of standardless requirements that cause[d] [the plaintiff's] injury."  *Id.* at 1275.

16

Here, it is undisputed that, like the plaintiff in *CAMP*, Barrett has at least once in the past applied for permission to speak at a Board meeting and intends in the future to seek permission to speak at upcoming Board meetings or planning sessions. That prior request was, and any future requests would be, subject to the provisions of the Policy that Barrett claims grants the Superintendent unbridled discretion. And since "the existence, not the imposition, of standardless requirements . . . causes [Barrett] injury," *id.*, on this record,[8] and under this line of precedent within the law of standing, Barrett may pursue his facial unbridled-discretion claim.

## IV.

By limiting to one the claims that he would defend on appeal, Barrett effectively agreed at oral argument that, as Defendants have urged, the entry of summary judgment in his favor on the remainder of his claims should be vacated. So based solely on the parties' stipulation, and without reaching the merits, we

---

[8] Standing normally is assessed on the pleadings when the parties have not yet conducted discovery. Here, however, the parties disputed Barrett's standing as a matter of fact by creating a factual record limited to that issue. The district court then used that factual record to rule on standing in granting Barrett's motion for partial summary judgment. On appeal, however, the parties do not dispute the narrow set of facts necessary to establish Barrett's standing for his facial unbridled-discretion claim. *See Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 1981) (explaining that, when a factual attack on subject-matter jurisdiction is premised entirely on undisputed facts, "our review is limited to determining whether the district court's application of the law is correct and . . . th[e] [undisputed] facts are indeed undisputed"). Opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

vacate the district court's entry of summary judgment in favor of Barrett on all claims other than the facial unbridled-discretion claim.

We therefore consider whether the district court correctly granted summary judgment in favor of Barrett on his facial unbridled-discretion claim and whether the district court properly entered a permanent injunction as a remedy for that claim. We review for abuse of discretion a district court's decision to grant a permanent injunction, but in conducting that review, we consider all underlying legal determinations, including the propriety of the entry of summary judgment, *de novo*. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1266 (11th Cir. 2006). Because we review the entry of summary judgment on a facial—as opposed to an as-applied—challenge to the Policy, we do not concern ourselves with the facts of Barrett's particular case—we simply interpret the Policy *de novo*. *See Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1197 (11th Cir. 1991).

## A.

To begin, we address the merits of the unbridled-discretion claim. Perhaps the plainest example of an unconstitutional grant of unbridled discretion is a law that gives a government official power to grant permits but that provides no standards by which the official's decision must be guided. *See Sentinel Commc'ns*, 936 F.2d at 1198-99. In these circumstances, the official can grant or deny a permit for any reason she wishes. Such a grant of unconstrained power is

18

unconstitutional under the First Amendment for two reasons: first, it creates an incentive for speakers to self-censor in hopes of being granted a permit, and second, it is difficult for courts to determine whether an official's standardless permit decision was impermissibly based on content or viewpoint. *See Lakewood*, 486 U.S. at 757-59.

But unbridled discretion can also exist when a permitting official has no time limit within which she must make a decision on a permit application. In *Granite State Outdoor Advertising, Inc. v. City of St. Petersburg*, 348 F.3d 1278 (11th Cir. 2003), we set forth a framework for determining whether a prior restraint that imposes no time limit on a permitting official to grant or deny permission to speak represents an unconstitutional grant of unbridled discretion. *See id*. at 1281-83.

Under the *Granite State* framework, if the prior restraint is content based, then the lack of a time limit necessarily renders the prior restraint unconstitutional. *See Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1270-72 (11th Cir. 2005). But if the prior restraint is content neutral, then the lack of a time limit does not necessarily invalidate the regulation. *See Granite State*, 348 F.3d at 1282 n.6 (holding that "time limits are not *per se* required when the licensing scheme at issue is content-neutral"). Rather, the court evaluates whether the content-neutral prior restraint "contain[s] 'adequate standards to guide the licensing official's

19

discretion and render it subject to effective judicial review.'" *Solantic*, 410 F.3d at 1270-71 (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002)).  Driving this analytical framework is the constitutional concern that an official with unbridled discretion could censor speech with which the official disagrees by inordinately delaying a decision on a potential speaker's application.  *See id.* at 1272.

Barrett assails two parts of the Policy as improperly lacking a time limit: the scheduling of the initial meeting with the Superintendent and the scheduling of the alleged "second meeting" with the Superintendent.  Defendants argue, as a preliminary matter, that the Policy does not require a second meeting and that the district court erred in interpreting the Policy as requiring such a meeting.  We agree with Defendants.

The Policy requires an initial meeting, and then, if the Superintendent decides to investigate an issue raised in the initial meeting, the Superintendent must "report back" to the prospective speaker with the results of his investigation within ten days.  In Barrett's case, that "report back" took the form of a second meeting, but nothing in the Policy prevents the Superintendent from reporting back via telephone or e-mail.  Regardless of the form of the "report back," it must take place within ten days of the initial meeting.  The "report back" requirement has a

time limit, so, at least in this respect, it does not render the Policy unconstitutional under an unbridled-discretion theory.

The scheduling of the initial meeting, however, has no time limit attached to it. We therefore engage in the *Granite State* analysis to discern whether that lack of a time limit effectively grants the Superintendent unbridled discretion in contravention of the First Amendment. For the reasons below, we hold that it does.

## 1.

Before conducting the *Granite State* analysis, we consider Defendants' argument that the unbridled-discretion doctrine does not apply here. According to Defendants, the unbridled-discretion doctrine applies to only prior restraints on speech, and the Policy is not a prior restraint. Our precedents recognize that the unbridled-discretion doctrine applies to prior restraints, *see, e.g.*, *Solantic*, 410 F.3d at 1270, but we need not decide today whether the unbridled-discretion doctrine could somehow be applied beyond the context of prior restraints because the Policy before us today is indeed a prior restraint.

"A prior restraint on expression exists when the government can deny access to a forum for expression before the expression occurs." *United States v. Frandsen*, 212 F.3d 1231, 1236-37 (11th Cir. 2000). Permitting ordinances, *see Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1250-51 (11th Cir. 2004), and

licensing ordinances, *see Solantic*, 410 F.3d at 1270, are classic examples of prior restraints, but the category is not rigid because court-ordered injunctions that forbid speech can also be considered prior restraints, *see Alexander v. United States*, 509 U.S. 544, 550 (1993). Without a permit or a license, the would-be speaker subject to the prior restraint cannot legally engage in the speech that the permit or license authorizes. Prior restraints contrast with "subsequent punishments," which regulate a given type of speech by penalizing the speech only *after* it occurs. *Alexander*, 509 U.S. at 550, 553-54; *see also Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ("If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time.").

The Policy, although not formally a licensing or permitting scheme, is a prior restraint and not a subsequent punishment because it *prevents* members of the public from speaking at a Board meeting unless they comply with the Policy's requirements. Nor are we persuaded by Defendants' argument that the Policy is not a prior restraint because the Superintendent has no power to grant or deny a request to speak so long as the Policy's prerequisites are satisfied. True, the Policy does not expressly confer on the Superintendent the right to grant or deny a request to speak. But the Policy also does not provide that any individual who seeks permission necessarily gets it.

It is the Procedures that fill that gap. The Procedures state that an individual may submit to the Superintendent a request to speak after meeting with the Superintendent and that the request must include the individual's name, address, purpose for making the request, and topic of speech. The Procedures next provide that "[e]ach person whose name is placed on the agenda will be given five (5) minutes to make their comments." But still missing from the Procedures is any explanation for how an individual's name gets placed on the agenda.

When we read the Procedures together with the Policy, however, we see that the Superintendent uses both substantive and procedural criteria to decide who can speak. The Policy provides that members of the public may "address the Board on issues of concern" unless the issue of concern is a "complaint against any employee of the Board." It also states that the Superintendent may deny access to a speaker whose speech he deems "repetitive" of another speaker's speech or "abusive or disruptive." The Superintendent likewise enjoys the power to redirect speech to a "special meeting[]" if he believes that the speech "stimulate[s] high community interest." These are substantive criteria that the Superintendent uses to decide whether to put an individual's name on the agenda. In addition to these criteria, the Superintendent uses procedural criteria (attending an initial meeting with the Superintendent, submitting a written request, complying with time requirements, etc.) to determine who can speak. Because the Policy prohibits

23

speech by those who do not satisfy the Policy's criteria, the Policy is a prior restraint.

**2.**

Courts use "'forum analysis' to evaluate government restrictions on purely private speech that occurs on government property." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015) (citation omitted). In forum analysis, we identify the type of government forum involved and then apply the test specific to that type of forum in evaluating whether a restriction violates the First Amendment.

Defendants argue that the unbridled-discretion doctrine does not apply to a limited public forum, such as the public-comment session of a Board meeting. As an initial matter, we agree with the parties that the public-comment sessions of the Board's meetings and planning sessions are limited public fora.[9]

The Supreme Court has referred to four categories of government fora: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum. It is undisputed that the public-comment sessions are not traditional public fora, which are defined as government properties that "ha[ve] immemorially been held in trust for the use of the public and, time out of mind,

---

[9] We consider the public-comment sessions in particular and not the Board meetings or Board planning sessions as a whole because forum analysis is limited to the particular part of the forum to which the would-be speaker has sought access. *See Bloedorn v. Grube*, 631 F.3d 1218, 1232 (11th Cir. 2011).

24

ha[ve] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Walker*, 135 S. Ct. at 2250 (internal quotation marks and citation omitted). The quintessential examples of traditional public fora are streets and parks. *See id.* As their name suggests, traditional public fora are defined by history: the Court has stated that this category of government property does not "extend[] beyond its historic confines." *Id.* (internal quotation marks and citation omitted).

Similar to the traditional public forum is the designated public forum. A designated public forum is "government property that has not traditionally been regarded as a public forum [but] is intentionally opened up for that purpose." *Id.* (internal quotation marks and citation omitted). So a designated public forum consists of government property that has been opened for the purpose of functioning, more or less, as a traditional public forum, even though it does not possess the historical pedigree of a traditional public forum. Nevertheless, a designated public forum differs from a traditional public forum in an important way: unlike in a traditional public forum, expressive activity in a designated public forum can be limited to a particular class of speakers instead of being opened to the general public. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-80 (1998). But once the designated public forum has been limited to that particular class, all members of that class must receive general access. *See id.* at 679-80.

A limited public forum, by contrast, "exists where a government has reserv[ed a forum] for certain groups or for the discussion of certain topics." *Walker*, 135 S. Ct. at 2250 (internal quotation marks and citation omitted). Unlike a designated public forum, then, a limited public forum cannot, by definition, be open to the public at large for discussion of any and all topics. And a limited public forum differs from a designated public forum in this respect because a designated public forum grants "general access" to the designated class, while a limited public forum can be set up to grant only "selective access" to that class. *Forbes*, 523 U.S. at 679-80. Under a system of selective access, members of the class do not enjoy unhindered access to the forum; instead, each individual member must obtain permission from the governmental proprietor of the forum, who in turn has discretion to grant or deny permission. *See id.*

The final forum category—the nonpublic forum—refers to property at which the government "act[s] as a proprietor, managing its internal operations." *Walker*, 135 S. Ct. at 2251. Earlier Supreme Court precedent used to consider what we now understand to be nonpublic fora simply "not fora at all," but at that time, the term "nonpublic forum" was synonymous with "limited public forum." *Forbes*, 523 U.S. at 677-78. The Supreme Court has since clarified that the terms "limited public fora" and "nonpublic fora" delineate two distinct types of fora. *See Walker*, 135 S. Ct. at 2250-51.

Here, the public-comment portions of the Board meetings and planning sessions fall into the category of limited public fora because the Board limits discussion to certain topics and employs a system of selective access. First, public comment is limited to "issues of concern," and speakers may not raise complaints against Board employees or engage in "abusive or disruptive" speech. This is content-based discrimination, which is permitted in a limited public forum if it is viewpoint neutral[10] and reasonable in light of the forum's purpose. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001).

And second, the Board grants only selective access to speakers: only those speakers who satisfy the Policy's substantive and procedural criteria may speak. In sum, then, the comment sessions are open to the public, but they are not open to the public at large for discussion of any and all topics. That makes the public-comment sessions limited public fora. *See Rowe v. City of Cocoa, Fla.*, 358 F.3d 800, 802 (11th Cir. 2004); *see also Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010).

Returning to Defendants' contention that the unbridled-discretion doctrine does not apply to limited public fora, we reject that position. Precedent of this

---

[10] "Viewpoint discrimination is . . . an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Although a limited public forum may rightly limit speech at the forum to only certain content, the First Amendment does not tolerate viewpoint-based discrimination against speech within the scope of the forum's subject matter. *See Good News Club*, 533 U.S. at 106-07. Viewpoint discrimination occurs "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

Court already compels the conclusion that prior restraints on speech can exist in limited public fora.

In *Atlanta Journal & Constitution v. City of Atlanta Department of Aviation*, 322 F.3d 1298 (11th Cir. 2003) (en banc), our Court sitting en banc considered whether Hartsfield Atlanta International Airport's newsrack-rental policy vested in the official charged with administering the policy unbridled discretion to set rental fees and to choose which rental applications to grant. *See id.* at 1307. We held that the discretion granted was unconstitutional because no standards governed the setting of the rental fee or the criteria upon which publications' rental applications were to be granted. *See id.* at 1310-11. We reasoned that this holding was necessary because, otherwise, the plan allowed the official who administered it to make his decisions "for any reason whatsoever, including unconstitutional reasons such as viewpoint discrimination." *Id.* at 1311 (citation omitted).

We identified viewpoint discrimination as a particular evil with which we were concerned because, earlier in our opinion, we ruled that the airport was a "nonpublic forum" and that, consequently, viewpoint-based discrimination was, as a general matter, impermissible in the airport even if content-based discrimination was permissible. *See id.* at 1306-07. At the time, we relied on *International Society for Krishna Consciousness, Inc. v. Lee ("ISKCON")*, 505 U.S. 672 (1992), to identify only three potential types of fora at issue: public fora, designated public

28

fora, and nonpublic fora.  *See Atlanta Journal*, 322 F.3d at 1306 & n.9.  We easily concluded, based on *ISKCON*, that the airport was a nonpublic forum.

As we have noted, however, more recent Supreme Court precedent clarifies that four types of government fora actually exist: the aforementioned three, and also the limited public forum.  *See Walker*, 135 S. Ct. at 2250-51.  And the Supreme Court has indicated that it has, in the past, used the term "nonpublic forum" when it should have employed the term "limited public forum."  *Compare Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 53-54 (1983) (referring to "other non-public forum cases"), *with Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 691 (2010) (transcribing but altering the same quote from *Perry* as "other [limited public] forum cases").  Perhaps the airport we denominated in *Atlanta Journal* as a "nonpublic forum" is better understood, in today's parlance, as a limited public forum; after all, the public was granted selective access to engage in the content-limited expressive conduct of newspaper circulation.

If that's true, then we have already applied the unbridled-discretion doctrine to a limited public forum, and so *Atlanta Journal* controls.  But even if we decline to engage in a revisionist reading of *Atlanta Journal* (which would require us to reinterpret the Supreme Court's *ISKCON* decision), and if we instead view *Atlanta*

29

*Journal* as pertaining to a nonpublic forum, we still must hold that the unbridled-discretion doctrine applies in limited public fora.

In *Atlanta Journal*, we applied the unbridled-discretion doctrine because of the risk that the airport's unrestrained permitting official would covertly engage in viewpoint discrimination, which was impermissible in a nonpublic forum, such as the airport.  Limited public fora likewise do not tolerate viewpoint discrimination, *see Good News Club*, 533 U.S. at 106-07, so the unbridled-discretion doctrine can serve the same purpose in a limited public forum that it serves in a nonpublic forum:  combatting the risk of unconstitutional viewpoint discrimination. Naturally, then, the unbridled-discretion doctrine applies in a limited public forum. *Accord Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Schs.*, 457 F.3d 376, 386-87 (4th Cir. 2006).[11]

---

[11] Just as the unbridled-discretion doctrine applies in a limited public forum, it is also true, contrary to our concurring colleague's suggestion, that a prior restraint can exist in a limited public forum.  As we discuss above, the Supreme Court has made clear that speech regulations fit into one of two categories: prior restraints and subsequent punishments.  The Policy fits neatly within the category of a prior restraint, just as the public-comment sessions of the Board meetings fit neatly within the category of a limited public forum.  A prior restraint is simply a regulatory mechanism that can be used to deny a speaker permission to speak before the speech occurs.  That type of mechanism can exist in a limited public forum just as easily as it can exist in any other type of forum.  Similarly, an official could operate a prior restraint with unbridled discretion in a limited public forum just as he could operate it with unbridled discretion in a forum of another type.

It is true, as our colleague points out, that content-based discrimination is less of a constitutional concern in limited public fora as it is in traditional and designated public fora.  But it is also true that, although limited public fora are more tolerant of content-based discrimination, limited public fora are no less inhospitable to viewpoint-based discrimination than any other type of forum is, and viewpoint discrimination is but "an egregious form of content discrimination," *Rosenberger*, 515 U.S. at 829.  And content-based discrimination can still occur in a limited

**3.**

Because the Policy is a prior restraint, and because Barrett takes issue with the lack of a time limit for the initial meeting, we next consider, under the *Granite State* framework, whether the Policy is content based or content neutral. Defendants argue that no risk of content-based discrimination exists here because the Policy does not require prospective speakers to disclose before the initial meeting the subject matter about which they wish to speak. And formalistically speaking, Defendants are correct.

But the unbridled-discretion doctrine is not so formalistic. Governing precedent establishes that prior-restraint schemes, when put into practice, might present enough of a risk of chilling otherwise-permissible speech on the basis of content that the schemes become, for all intents and purposes, content based.

The prior-restraint sign-permitting scheme in *Café Erotica of Florida, Inc. v. St. Johns County*, 360 F.3d 1274 (11th Cir. 2004), presented this problem. The county government in that case argued that the scheme was not content based

public forum subject to a prior-restraint regulation that grants its operating official unbridled discretion. For example, and as our analysis below suggests, an individual who satisfies a limited public forum's criteria for speaking about a particular topic that falls within the range of permissible content in that forum can nonetheless be excluded from the forum on the basis of content if the official who operates the prior-restraint regulation has unbridled discretion and decides to covertly discriminate by delaying approval of the undesirable would-be speaker's request to speak.

Finally, we note that we broach the concept of a "prior restraint," instead of merely applying the unbridled-discretion line of caselaw, because the Board has raised prior-restraint issues in its briefing, and our resolution of those issues provides further analytical clarity to what is undeniably a complex area of the law.

31

because the scheme's permit application did not require applicants to disclose the messages they intended to put on their signs, so the official who administered the application process would not be aware of the content of those messages. *See id.* at 1289.

We rejected the county's contention for two reasons. First, the permit application required applicants to indicate, on a more general level, whether their sign would display commercial or political messages. *See id.* at 1279, 1287-89. And second, we were equally concerned with the potential for the permit administrator to more finely evince the content of applicants' intended messages by using context clues. We reasoned that an administrator "can often infer the content based on the nature of the applicant's business," especially when "a long history of conflict" exists between the business (in that case, an adult-entertainment business) and the county. *Id.* at 1289. For these reasons, we observed that "[w]ithout discretion-checking guidelines, there is a distinct possibility that the County could decline to issue . . . a permit based on content," and that, consequently, the ordinance itself "d[id] in fact distinguish based on content." *Id.*

To reach that conclusion, we relied on *Lakewood*, in which the Supreme Court considered a city's ordinance that required newspapers to apply annually for licenses to use newsracks. *See* 486 U.S. at 759. Under this scheme, newspapers

32

had to "apply for multiple licenses over time, or periodically renew [their] license." *Id.* The Court discerned that "[w]hen such a system is applied to speech, or to conduct commonly associated with speech, the licensor does not necessarily view the text of the words about to be spoken, but can measure their probable content or viewpoint by speech already uttered." *Id.* So a licensor would know, based on its knowledge of the newspaper, the type of content or viewpoint the newspaper published and thus the type of content or viewpoint it would likely publish in the future. With that knowledge in mind, the licensor could covertly discriminate on the basis of content or viewpoint in granting licenses if his discretion were not sufficiently cabined. *See id.* In *Café Erotica*, we took this reasoning to mean that, under circumstances like those before us in that case, the potential for content-based discrimination is so high that the prior restraint must be deemed content based.

Such circumstances are before us again today. In this close-knit school-board community, it is quite possible—indeed, likely, in many situations—that the Superintendent will have an idea of what a prospective speaker's proposed subject matter will be before the Superintendent schedules an initial meeting with the speaker. In a scenario like Barrett's, for example, a critic of a Board policy who spoke against that policy at a prior meeting may attempt to speak against it again at the next Board meeting. The Superintendent can avoid scheduling an initial

33

meeting with that critic, preventing him from complying with the Policy, which in turn bars the critic from speaking at the next meeting, thus censoring that critic's point of view.

As an another example, an individual seeking an initial meeting with the Superintendent could be a representative of an organization with a narrowly defined purpose, such as a religious group or labor union, and the nature of the organization could strongly suggest to the Superintendent the group's topic of speech—whether in terms of content or viewpoint.  In another scenario like Barrett's, a speaker could have an initial meeting with the Superintendent, be placed on the agenda with permission to speak at the next meeting, but then fail to attend the meeting for whatever reason.  If the speaker went through the approval process again in order to speak at the following meeting, the Superintendent, upon receiving the speaker's request for a new initial meeting, would have a pretty good idea of what the speaker's intended topic of speech is—and this time around, the Superintendent might have second thoughts about allowing that speaker to speak.

Nor does anything in the Policy preclude the Superintendent from inquiring into a speaker's speech content or viewpoint before scheduling an initial meeting. Of course, if the Superintendent made such an inquiry, the speaker could respond that the Superintendent had no right to make the inquiry.  But the Superintendent could take the speaker's refusal to disclose her topic as an indication that the

content might not be friendly towards the Board. And many speakers would simply disclose to the Superintendent the subject matter of their intended speech. Indeed, in requesting an initial meeting with the Superintendent, some speakers would disclose their intended topic of speech without being prompted to do so.

These concerns only increase when we consider that related parts of the Policy are content based. The issues about which the speaker wishes to speak are discussed at the initial meeting. The Superintendent then has the power to conduct his own investigation of the issues raised and can further inquire into the potential content and viewpoint of the speaker's speech. And once the time comes for the Superintendent to grant or deny permission to speak, the Superintendent accounts for various content-based criteria: whether the speech involves "issues of concern"; whether it involves complaints against Board employees; whether it is "repetitive" of other speech; whether it is "abusive or disruptive"; and whether the speech should be redirected to a "special meeting[]" because it "stimulate[s] high community interest." The Policy, which allows a searching inquiry into content, differs from the content-neutral prior-restraint scheme in *Granite State*, under which the administering official made only superficial and passing review of the general content of an application. *See* 348 F.3d at 1282 & n.3.

In short, the Policy's requirement that potential speakers schedule an initial meeting with the Superintendent is content based because it poses enough of a risk

that speech will be chilled or effectively censored on the basis of content or viewpoint. And because the initial-meeting provision lacks any time limit with which the Superintendent must comply, the requirement is unconstitutional under the *Granite State* framework. If Defendants wish to continue requiring potential speakers to meet with the Superintendent before submitting a request to speak, Defendants must impose a reasonable time limit within which the Superintendent must respond to the speaker's request, schedule the initial meeting, and hold the initial meeting. The district court properly entered summary judgment in favor of Barrett on his facial unbridled-discretion claim, although we affirm that judgment solely for the reasons laid out in this opinion.

## B.

Next, we address whether the court properly entered a permanent injunction as the remedy for Barrett's unbridled-discretion claim. To obtain a permanent injunction, a plaintiff must show (1) that he has suffered an irreparable injury; (2) that his remedies at law are inadequate; (3) that the balance of hardships weighs in his favor; and (4) that a permanent injunction would not disserve the public interest. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The elements for a permanent injunction are satisfied here. First, Barrett suffered an irreparable injury. His right to speak at the February 17 meeting was violated and his right to speak at future meetings was chilled and could be

36

prevented altogether under the Policy. *See Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc) ("The only areas of constitutional jurisprudence where we have said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether." (citations omitted)). And since Barrett suffered irreparable harm, his remedies at law were inadequate. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981)[12] ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").

As for weighing the balance of hardships, the Board's need to redraft one part of the Policy to provide time constraints and the Superintendent's subsequent need to be a bit more disciplined in maintaining his schedule hardly compare to the deprivation of Barrett's and all other potential speakers' constitutional right to engage in free speech. Finally, the injunction does not disserve the public interest. *See Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001) ("[T]he public interest is always served in promoting First Amendment values.").

Defendants opine that the district court's injunction actually disserved the public interest because Defendants discontinued providing public-comment sessions at Board meetings in light of the injunction, but Defendants confuse the

---

[12] Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

issue.  The issue is not whether speech should be allowed at all; as the parties agree, the comment sessions at Board meetings are limited public fora, meaning that the Board chose, but was not required, to open those portions of its meetings for public participation.  *See Rosenberger*, 515 U.S. at 829-30.  Consequently, the Board has the power to close its meetings to public comment if it so wishes.  The problem here, rather, is the fact that the Board allows public comment at its meetings but then maintains policies that have a significant potential to chill speech on the basis of content and viewpoint.  So the district court's injunction did not create a new constitutional wrong, as Defendants suggest—it instead remedied a wrong of Defendants' creation.[13]

The district court did not abuse its discretion in granting a permanent injunction.  But because we affirm the district court's entry of summary judgment with respect to only the facial unbridled-discretion claim, the district court must

_____

[13] We also reject Defendants' procedural argument that the injunction should be vacated because Barrett did not argue the elements for permanent injunctive relief in his motion for summary judgment.  Although Barrett did not so argue in his motion for summary judgment, at the time he filed that motion, his motion for a preliminary and consolidated permanent injunction was still pending  And there, he extensively argued the elements for permanent injunctive relief.  Plus, only after Barrett filed his summary-judgment motion did the district court deny as moot, in light of the summary-judgment motion, the motion for a preliminary and consolidated permanent injunction, since the district court erroneously assumed the later motion to be sufficiently duplicative of the earlier one.  Under these circumstances, the court reasonably could have concluded that denying Barrett an injunction that he was otherwise entitled to merely because of a mix-up in the briefing that occurred in part because the court was trying to efficiently manage a case that was becoming increasingly complex, would be inequitable.  We also note that the court enjoyed the benefit of adversarial briefing, since Defendants vigorously disputed the elements for injunctive relief in their response to Barrett's motion for a preliminary and consolidated permanent injunction.

alter the scope of the injunction on remand so that the injunction remedies only the harm created by the unconstitutional grant of unbridled discretion that we have previously discussed.

## V.

Defendants assert a number of arguments for why the district court should have granted their motion for an extension of time so that they could respond to Barrett's motion for partial summary judgment after the close of discovery. We review both the denial of a motion for extension of time and the denial of a motion seeking discovery under the abuse-of-discretion standard. *See Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 863-64 (11th Cir. 2004); *R.M.R. v. Muscogee Cty. Sch. Dist.*, 165 F.3d 812, 816 (11th Cir. 1999).

Defendants first contend that courts hesitate to rule on facial claims without the benefit of fully developed factual records. To be sure, there are reasons to be wary of prematurely adjudicating facial challenges. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008). But we have nevertheless recognized that, when facial challenges raise only questions of law and do not implicate disputed facts, ruling on a facial challenge without waiting for the parties to complete discovery is entirely proper. *See World Holdings, LLC v. Federal Republic of Germany*, 701 F.3d 641, 654-55 (11th Cir. 2012). For the reasons we have discussed, this is one of those situations.

39

Defendants additionally identify a number of issues as to which they wanted to conduct discovery.   But as our discussion of Barrett's standing and his unbridled-discretion claim shows, the information Defendants sought was immaterial to the resolution of those issues.[14]  For this reason, the district court did not abuse its discretion in denying Defendants' motion.

## VI.

We **AFFIRM** the district court's entry of summary judgment in favor of Barrett with respect to his facial unbridled-discretion claim; we **VACATE** the entry of summary judgment concerning all other claims adjudicated in Barrett's favor; we **AFFIRM** the court's denial of Defendants' motion for extension of time; and we **REMAND** this case to the district court for further proceedings consistent with this opinion, including a modification of the permanent injunction.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

[14] Some of the information sought also should have been in Defendants' possession.

JULIE CARNES, Circuit Judge, concurring:

I concur in the panel opinion's holding that the Walker County School Board's public comment policy is unconstitutional because it gives the Superintendent unbridled discretion to prohibit speech that is within the scope of and otherwise permitted by the policy.[1]  I further agree that the proper remedy to address the constitutional violation is an injunction precluding the Board from enforcing the policy to the extent it grants such unbridled discretion to the Superintendent.  I write separately, however, because I conclude that the prior restraint analysis underpinning the panel opinion is not applicable to a comment policy governing speech in a limited public forum, which is what the school board meetings in this case were.  Instead of applying prior restraint analysis, I would resolve the appeal simply by applying the unbridled discretion rule as set forth by this Court in *Atlanta Journal and Constitution v. City of Atlanta Department of Aviation* ("*AJC*"), 322 F.3d 1298 (11th Cir. 2003).

School board meetings are not traditional public fora.  *See Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011) ("Traditional public fora are public areas such as streets and parks that [historically] have been used for purposes of

---

[1]  As the panel opinion correctly observes, Barrett abandoned all other claims on appeal.  I therefore concur in the panel's holding that the injunction entered by the district court must be vacated as to the abandoned claims.  I also concur in the opinion's rulings that (1) Barrett has standing to purse his unbridled discretion claim and (2) the district court did not abuse its discretion by denying the Board's motion for an extension of time to conduct discovery.

assembly, communicating thoughts between citizens, and discussing public questions." (internal quotation marks omitted)).  Consequently, the public is not presumptively entitled to attend or speak at such meetings.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("As we have stated on several occasions, the State, no less than a private owner of property has power to preserve the property under its control for the use to which it is lawfully dedicated." (internal quotation marks omitted)).  Nonetheless, although it was not required to do so, the Board has adopted a public comment policy by which the public is invited to appear at Board meetings and to address the Board at "appropriate" times, provided the procedural requirements of the policy are met.  Although the policy thus allows for public speech under certain conditions, it expressly states that the primary purpose of Board meetings is not to provide a public forum but to conduct the business of the school system.  As such, the policy creates a limited public forum for qualified speakers during the public comment session of Board meetings.  *See Bloedorn*, 631 F.3d at 1231 (explaining that a limited public forum is created "when the government limits its property to use by certain groups or dedicates it solely to the discussion of certain subjects." (alterations adopted and internal quotation marks omitted)).

In order to be constitutionally valid, regulations imposed on speech in a limited public forum must be "reasonable and viewpoint neutral."  *Id.*  In addition,

42

and regardless of the type of forum involved, the regulatory scheme must not give government officials unbridled discretion to prohibit speech that is otherwise permissible in the forum. *See AJC*, 322 F.3d at 1310–11 ("A grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional."). In *AJC*, this Court held that a plan allowing newspaper publishers to apply for permission to rent and place their newspapers in city-owned newsracks in the Atlanta airport was unconstitutional because it lacked clear standards to guide the official charged with granting applications and setting the rental fee. *See id.* The Court explained that:

> [T]he plan permits the [official] to cancel a publisher's license for any reason whatsoever, including unconstitutional reasons such as viewpoint discrimination. Such unbridled discretion vests broad censorial power in government and this the Constitution does not permit.

*Id.* at 1311.

Although *AJC* arose in the context of a non-public forum (the Atlanta airport), its rationale concerning unbridled discretion is equally applicable to a limited public forum. Specifically, in *AJC* our Court reasoned that when government officials have unbridled discretion to regulate speech, the resulting censorial power creates an unacceptable risk of viewpoint discrimination. *Id.* The risk of viewpoint discrimination is at least as much of a concern in a limited public forum as it is in a non-public forum. *See Good News Club v. Milford Cent. Sch.*,

43

533 U.S. 98, 120 (2001) (concluding that the denial of a religious club's access to a limited public forum constituted impermissible viewpoint discrimination in violation of the First Amendment).

In my view, a straightforward application of the unbridled discretion rule set forth in *AJC* resolves this case. As relevant to Barrett's unbridled discretion argument, the Board's public comment policy requires that a would-be speaker who wants to address the Board about an "issue of concern" first "meet with the Superintendent and discuss [his] concern." Following the initial meeting, and any subsequent investigation and "report back" deemed necessary by the Superintendent, the speaker must make a written request to the Superintendent "at least one week prior" to the scheduled Board meeting. The policy, however, does not place any time constraints on the Superintendent's scheduling of this initial meeting, which is a prerequisite to speaking at a Board meeting. Rather, the Superintendent has the sole discretion to schedule—or to avoid scheduling, as the case may be—the required initial meeting at his will. In short, by declining to ever schedule a meeting, or by scheduling a meeting too late to satisfy the requirement that a putative speaker make his request at least a week before the Board meeting, the Superintendent has the power to prevent the speech. Thus, because it gives the Superintendent unbridled discretion to indefinitely delay the required initial meeting—and thereby prohibit speech that is within the scope of the forum and

44

otherwise permissible under the policy—this regulatory scheme is constitutionally impermissible. *See AJC*, 322 F.3d at 1310–11.

The panel opinion relies on *AJC*, but it also purports to apply prior restraint analysis. I, however, do not think that prior restraint analysis applies to the Board's public comment policy, or that it applies more generally in the limited public forum context. As the opinion points out, prior restraint analysis is most commonly applied in the permitting and licensing context. *See Café Erotica of Florida*, *Inc. v. St. Johns Cty.*, 360 F.3d 1274, 1279–82 (11th Cir. 2004) (applying prior restraint analysis to a municipal sign ordinance); *Solantic*, *LLC v. City of Neptune Beach*, 410 F.3d 1250, 1270 (11th Cir. 2005) (same); *Burk v. Augusta-Richmond Cty.*, 365 F.3d 1247, 1250–51 (11th Cir. 2004) (describing a county ordinance requiring a permit for public demonstrations by groups of five or more people as a prior restraint); *United States v. Frandsen*, 212 F.3d 1231, 1236–37 (11th Cir. 2000) (applying prior restraint analysis to a federal regulation requiring a permit in order to protest in national parks).

The panel cites a few cases in which prior restraint analysis has been applied in other contexts. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 570 (1976) (holding that a court-ordered injunction forbidding the media from publishing information related to an ongoing criminal proceeding was an unconstitutional prior restraint). But significantly none of the cases cited by the panel apply prior

45

restraint analysis to a speech regulation arising in the limited public forum context.[2]    Instead, the cited cases apply prior restraint analysis to speech regulations imposed on private speech or on speech made in a traditional public forum.

Prior restraint analysis is readily applicable to regulations imposed on private speech or on speech made in a traditional public forum, because it incorporates the same rigorous standards that are generally applicable in those contexts.  *See Perry*, 460 U.S. at 45 ("In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed.").  Specifically, a prior restraint is "presumptively unconstitutional and face[s] strict scrutiny."  *Burk*, 365 F.3d at 1251.  *See also Café Erotica*, 360 F.3d at 1282 (noting that "any system of prior restraint bears a heavy presumption against its constitutional validity" (alterations adopted and internal quotation marks omitted)); *Frandsen*, 212 F.3d at 1237 ("Although prior restraints are not *per se* unconstitutional, there is a strong presumption against their constitutionality.").  Nevertheless, a prior restraint may

---

[2]  I recognize that the term "prior restraint" has been used in some non-public forum cases to describe speech regulations that are subject to a facial constitutional challenge because they grant government officials unbridled discretion to prohibit disfavored speech.  *See Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1197 (11th Cir. 1991).  But the panel opinion does more than just use the term; it incorporates aspects of an analysis that typically applies only to regulations that are called prior restraints because they either prohibit private expression or deny access to a public forum before any expression has occurred.  I refer to this analysis as "prior restraint analysis."

be constitutionally sound if it qualifies as a content-neutral regulation on the "time, place, and manner of expression rather than a regulation of content" and if it "survive[s] intermediate scrutiny." *Burk*, 365 F.3d at 1251.

It is difficult to reconcile the above-described strict prior restraint analysis with the less rigorous standards that govern restrictions imposed on speech in a limited public forum, however. *See Good News Club*, 533 U.S. at 106 ("If the forum is a traditional or open public forum, the State's restrictions on speech are subject to stricter scrutiny than are restrictions in a limited public forum."); *AJC*, 322 F.3d at 1306 ("When [a government] seeks to regulate speech on government-owned property which is not a public forum . . . the standard is modified, becoming more deferential to regulation."). For example, it is well-established that the regulation of speech in a limited public forum is only subject to reasonableness review, rather than strict or intermediate scrutiny. *See Bloedorn*, 631 F.3d at 1231 ("Any restrictions made on expressive activity in a limited public forum only must be reasonable[.]"). Likewise, there is no basis in the case law for treating restrictions on speech as constitutionally suspect in the limited forum context. On the contrary, such restrictions generally are constitutional as long as they are reasonable in light of the purpose served by the forum. *See Bloedorn*, 631 F.3d at 1231. Indeed, the restrictions need not even be the "most reasonable" ones available. *See id.*

47

Another aspect of prior restraint analysis incongruent to examination of a limited public forum is its focus on content-neutrality. *See Burk*, 365 F.3d at 1255 (suggesting that the constitutionality of a prior restraint often depends on whether the restraint is determined to be content-based and thus subject to strict scrutiny); *Solantic*, 410 F.3d at 1270 (emphasizing the importance of content-neutrality in determining whether a prior restraint is constitutional). As noted, restrictions on speech in a limited public forum need only be <u>viewpoint</u>-neutral to be constitutional, not <u>content</u>-neutral. *See Bloedorn*, 631 F.3d at 1231. The panel opinion thus recognizes, and the case law clearly establishes, that content-based discrimination is permissible in a limited public forum as long as viewpoint neutrality is maintained. *See AJC*, 322 F.3d at 1306 ("On government property that has not been made a public forum, not all speech is equally situated, and the state may draw distinctions which relate to the special purpose for which the property is used." (internal quotation marks omitted)); *Good News Club*, 533 U.S. at 106 (noting that a limited public forum may be reserved "for the discussion of certain topics"). In fact, the government's ability to discriminate between content—or in other words, to designate the specific topics that can be discussed in the forum it has created—is a defining feature of a limited public forum. *See Bloedorn*, 631 F.3d at 1231 (explaining that the government's right to make such distinctions is "implicit in the concept of a government forum that has not been

48

opened widely to the general public" (alteration accepted and internal quotation marks omitted)).

Yet, under the panel opinion's prior restraint analysis, the constitutionality of the Board's public comment policy purportedly hinges on whether the policy is content-based or content-neutral. Citing *Granite State Outdoor Advertising*, *Inc. v. City of St. Petersburg*, 348 F.3d 1278 (11th Cir. 2003), the opinion notes that the lack of a time limit necessarily renders a content-based prior restraint unconstitutional. The panel then conducts a searching inquiry into whether the policy is content-based and, concluding that it is, holds that the policy is thus invalid because it does not contain any time constraints for the Superintendent to schedule the required initial meeting. Again, I agree that the policy is invalid in this respect, because by giving the Superintendent carte blanche to deny a speaker an opportunity to speak— simply by delaying the preliminary meeting that is a prerequisite for that opportunity—the policy allows the Superintendent to discriminate based on the viewpoint of the intended speaker. But to repeat, I find the panel opinion's focus on the absence of content-neutrality in the policy to be misplaced in what is clearly a limited public forum context.

For these reasons, I respectfully decline to join in the panel opinion's prior restraint discussion or in its inquiry concerning whether the Board's public comment policy is content-based. Nevertheless, and based on *AJC* and other

49

guiding precedents, I concur in the panel's holding that the policy is unconstitutional because it violates the unbridled discretion doctrine. Specifically, the policy creates a forum for public speech, conditions access to the forum on having an initial meeting with a government official, and vests in that official the sole and unfettered discretion to determine when to schedule the meeting. That amounts to a "grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities," which is not permitted by our governing precedent. *AJC*, 322 F.3d at 1310. *See also Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("Once it has opened a limited forum . . . the State must respect the lawful boundaries it has itself set.").